MASSACHUSETTS BAY TRANSPORTATION AUTHORITY *vs.*
BOSTON SAFE DEPOSIT AND TRUST COMPANY
& others.

Suffolk.    January 27, 1965. — February 25, 1965.

Present: WHITTEMORE, CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Mass Transportation. Massachusetts Bay Transportation Authority. Commonwealth,* Financial matters, Political subdivisions, Mass transportation. *Constitutional Law,* Public purpose, Delegation of powers, Expenditure of public money, Borrowing by the Commonwealth, Credit of the Commonwealth, Mass transportation, Amendment of the Constitution. *Administrative Matter.*

G. L. c. 161A creating the Massachusetts Bay Transportation Authority with extensive powers respecting mass transportation was enacted for a public purpose notwithstanding that incidental private advantage may result from coöperation by the Authority with private enterprise pursuant to the statute.    [542]

Constitutionally adequate standards for and controls upon the exercise by the Massachusetts Bay Transportation Authority of its powers with respect to transportation, including its dealings with private companies, are contained in G. L. c. 161A.    [545]

Determinations by the Massachusetts Bay Transportation Authority, "a body politic and corporate and a political subdivision of" the Common-

348 Mass. 538                                                    539

Massachusetts Bay Transp. Authy. *v.* Boston Safe Deposit & Trust Co.

wealth existing under G. L. c. 161A, made within the Authority's statutory powers and in accordance with statutory requirements, as to the method of providing transportation in the public interest are not and constitutionally need not be subject to judicial review.   [549–550]

Adequate standards for the guidance of the Executive Office for Administration and Finance in contracting for financial assistance by the Commonwealth to the Massachusetts Bay Transportation Authority are provided by G. L. c. 161A, § 28.   [553]

Borrowings by the Massachusetts Bay Transportation Authority, an independent political subdivision, pursuant to G. L. c. 161A are not in substance borrowings by the Commonwealth despite the provisions of c. 161A involving the Commonwealth in repayment of the money borrowed, and are not subject to art. 62, § 3, of the Amendments of the Massachusetts Constitution requiring that certain borrowings by the Commonwealth be authorized by a two thirds vote in each branch of the Legislature.   [556–557]

Giving or lending the credit of the Commonwealth under G. L. c. 161A to the Massachusetts Bay Transportation Authority, a political subdivision established to deal with transportation matters in the public interest, does not conflict with the prohibition in art. 62, § 1, of the Amendments of the Massachusetts Constitution against giving or lending the credit of the Commonwealth "to or in aid of any individual, or of any private association, or of any corporation which is privately owned and managed," notwithstanding any indirect and incidental benefit to others than the Authority.   [558]

The enactment prior to November 3, 1964, of St. 1964, c. 563, inserting in the General Laws c. 161A providing for a pledge of the credit of the Commonwealth to the Massachusetts Bay Transportation Authority was itself the pledge within art. 62, § 1, of the Amendments of the Massachusetts Constitution, and such pledge was not affected retroactively by the amendment of art. 62, § 1, on November 3, 1964, by art. 84, requiring that pledges of the credit of the Commonwealth be enacted by a two thirds vote in each branch of the Legislature; the fact that no specific action respecting such pledge had been taken pursuant to c. 161A prior to the 1964 constitutional amendment was immaterial.   [558–560]

The provisions of G. L. c. 161A, §§ 8–11, for apportionment of net cost of service among the municipalities in the Massachusetts Bay Transportation Authority, considered in conjunction with the definition of "Commuters" in § 1, are reasonable and valid.   [560–563]

Bill in equity filed in the Supreme Judicial Court for the county of Suffolk on January 8, 1965.

The suit was reserved and reported by *Reardon, J.*

The case was submitted on briefs.

*James W. Perkins & Raya S. Dreben* for the plaintiff.

*Austin S. Ashley & Wilmot R. Hastings* for the defendants.

WHITTEMORE, J.   This proceeding for declaratory relief has been reported without decision on the pleadings and a stipulation that brings before us as a case stated the facts established by the pleadings.   The allegations of the bill are admitted.   The Attorney General has acknowledged notice that constitutional questions are involved.   G. L. c. 231A, § 8.   The questions relate to St. 1964, c. 563, which by § 18 inserted G. L. c. 161A.

Chapter 161A, by § 2, creates the Massachusetts Bay Transportation Authority and makes the territory of seventy-eight municipalities of Greater Boston and their inhabitants "a body politic and corporate and a political subdivision of the commonwealth."   Fourteen of these cities and towns, Boston and communities adjacent or close to Boston (which constituted the Metropolitan Transit Authority under St. 1947, c. 544, § 1), are differentiated from the other sixty-four cities and towns.

The statute grants the Authority extensive powers in respect of mass transportation facilities.   It may own and operate such facilities.   It may contract with, subsidize, and lease facilities to private companies.   It may borrow money on bonds or notes.   The statute provides for annual payments by the Commonwealth to the Authority of its "net cost of service," and the apportionment of such deficit payments among the seventy-eight cities and towns on a weighted basis.   The statute also provides for additional payments from the Commonwealth under contracts of assistance, the effect of which will be to reduce the deficit payments by cities and towns and place certain financial burdens on the Commonwealth.   It contemplates that the Authority will receive revenue from its operations and may receive grants or gifts.   Provisions of the statute, so far as material to the issues before us, will be discussed later in this opinion.

### THE TRANSPORTATION CRISIS AND THE AUTHORITY'S IMMEDIATE PLANS.

The financial situation of the majority of the railroads providing commuter service to Boston is critical.   Permis-

348 Mass. 538                                                 541

Massachusetts Bay Transp. Authy. *v.* Boston Safe Deposit & Trust Co.

sion of the Interstate Commerce Commission to abandon service is being sought or has been given. Help by the Authority is necessary because of imminent cessation of commuter service and the cost and difficulty of reëstablishing service once abandoned. There is a similar crisis in bus service in the Greater Boston area. The Authority can best furnish aid to bus companies by leasing new facilities and equipment at rentals "calculated to provide the necessary financial aid." It must issue bonds under § 23 in order to acquire such property for such leasing.

The Authority must also issue bonds or notes under § 23 to meet its ordinary needs for new equipment and capital improvements and for expansion and improvement of publicly owned and operated mass transportation in Metropolitan Boston. State assistance is required so that the Authority may meet the large capital needs of public transportation and the needs for assistance to privately owned transportation companies.

The Commonwealth through the Executive Office for Administration and Finance (Executive Office) has contracted with the Authority to furnish such assistance. As a means of providing necessary financing the Authority has also contracted with the defendant banks for the purchase by the banks of $1,000,000 of temporary notes under §§ 12 and 27 and the Authority has voted to make the borrowing.

### The Controversy — The Issues.

The contract with the banks is subject to four conditions: (1) That the notes be valid obligations of the Authority; (2) That the notes have the security mentioned in §§ 12 and 13; (3) That the Authority and the Executive Office contract for State aid; (4) That State assistance may lawfully be granted in respect of the notes. Upon the basis of the opinion of counsel to the effect that they are unable to certify that the four conditions have been met, the banks decline to go through with the purchase of the notes.

The following are the principal issues: (1) Does G. L. c. 161A establish constitutionally adequate standards under

which the Authority is to disburse to private companies the funds received from the notes? (2) Is the Commonwealth primarily liable so that there is in effect a borrowing by it without a two-thirds vote as required by art. 62, § 3, of the Amendments to the Constitution? (3) Is the Commonwealth pledging its credit for the purpose of making payments to a limited class of private companies in contravention of art. 62, § 1? (4) Is there a loan of the Commonwealth's credit without a two-thirds vote in violation of art. 62, § 1, as amended by vote of the electorate, November 3, 1964? (5) Are the provisions for apportionment of net transportation costs among the seventy-eight cities and towns within constitutional limits?

## I.

### THE CONSTITUTIONALITY OF THE BROAD PURPOSE OF THE STATUTE.

The general purpose of G. L. c. 161A is, as the defendants recognize, clearly public. *Opinion of the Justices,* 337 Mass. 800, 806–807, and cases cited. Transportation concerns every inhabitant of the Commonwealth and every aspect of our society. Even if private enterprise were able to provide it, the public interest would support public action. Where private enterprise has failed, the public interest and the legislative duty to serve that interest by specific enactment are plain. Provisions empowering the Authority to coöperate with private enterprise to accomplish the public purpose are not made invalid by resulting incidental private advantage. *Court St. Parking Co.* v. *Boston,* 336 Mass. 224, 227–231.

## II.

### THE ADEQUACY OF THE STATUTORY STANDARDS.

#### A. STANDARDS FOR ACTION BY THE AUTHORITY.

1. The Authority is that kind of agency of the sovereign for which broad general powers and standards are appropriate. See *Opinion of the Justices,* 334 Mass. 721, 739,

743. To meet the public need the Legislature has created a "political subdivision of the Commonwealth." G. L. c. 161A, § 2. The Authority has some resemblance to a county, a regional school district, or a fire, improvement, or incinerator district. G. L. c. 34; c. 71, §§ 14–16H; c. 48, §§ 60–80; c. 40, §§ 44, 44A–44K. The Authority is suitably placed within the existing political framework of the Commonwealth. Its operations are coördinated with the operations of existing agencies. It is subject to appropriate controls.

The Authority is managed (§ 6) by a board of five directors appointed by the Governor for five year terms subject to approval — two by the council, one by the advisory board of the Authority, one by the fourteen cities and towns, and one by the sixty-four cities and towns, with provisions for weighted votes. The board must include a person experienced in transportation, a member of a national or international labor organization, and a person experienced in administration and finance.

The Authority by § 3 has general powers appropriate to a political subdivision including the power to make by-laws and rules and regulations (§ 3 [e]); to grant easements (§ 3 [m]); to take real property by eminent domain (§ 3 [o]); and to buy, sell, lease, pledge, and otherwise deal with property "as may be necessary for or incident to" accomplishing the purposes of the statute (§ 3 [q]).

Certain action requires the approval of the advisory board. This, by § 7, consists of representatives of the seventy-eight municipalities: the city manager in Plan D or Plan E cities and in other cities, the mayor, and the chairman of the selectmen of each town. The voting of these members is weighted in relation to the assessments under the statute.

The Authority, like other political subdivisions, must operate under a budget approved by representatives of the people who are its inhabitants. Section 5 (i) specifies that current expenses be in accordance with an itemized budget that is to be approved by the advisory board, "subject to

such itemized reductions therein as the advisory board shall deem appropriate.'' There may be supplementary budgets over which the advisory board has like power.

The Authority by § 5 (h) reports annually to the Governor, the advisory board, and the Legislature ''its operations for the preceding calendar year, including therein a description of the organization of the authority, its recommendations for legislation, and its comprehensive program for mass transportation as most recently revised.'' By § 17, the State Auditor is required to make an annual audit of the accounts of the Authority and to "make a report thereon to the directors, the governor and the general court.''

2.   The standards for action to carry out a declared legislative policy may be found not only in the express provisions of a statute but also in its necessary implications. The purpose, to a substantial degree, sets the standards. A detailed specification of standards is not required. The Legislature may delegate to a board or officer the working out of the details of a policy adopted by the Legislature. *Commonwealth* v. *Sisson,* 189 Mass. 247. *Chelsea* v. *Treasurer & Recr. Gen.* 237 Mass. 422, 431. *Commonwealth* v. *Hudson,* 315 Mass. 335, 341–342. *Scannell* v. *State Ballot Law Commn.* 324 Mass. 494, 501. *Opinion of the Justices,* 330 Mass. 713, 719. *Opinion of the Justices,* 334 Mass. 721, 743 (Massachusetts Port Authority had wide scope as to provisions of an authorized trust agreement).

In *Butler* v. *East Bridgewater,* 330 Mass. 33, 37–38, under a statute permitting regulation of soil removal, a by-law requiring a permit, without stating standards for its issuance, was held valid. ''The manifest objects of the enabling act and of the by-law furnish in themselves a large measure of guidance. . . . It was . . . [the] duty [of the selectmen] to act in a fair, judicial and reasonable manner upon the evidence . . . keeping in mind the objects of the by-law.'' *Building Commr. of Medford* v. *C. & H. Co.* 319 Mass. 273, 281–282, holds valid an ordinance that required a board in granting a dumping permit to consider the effect

348 Mass. 538                                                                      545

Massachusetts Bay Transp. Authy. v. Boston Safe Deposit & Trust Co.

upon the neighborhood and the city, and had other provisions that indicated that the board should act to "protect the community" and its "interest" and avoid "substantial injury." In *Burnham* v. *Board of Appeals of Gloucester,* 333 Mass. 114, 118, we held standards adequate wherein the only express requirement was to consider "the effects upon the neighborhood and the City at large." See *Liggett Drug Co. Inc.* v. *License Commrs. of No. Adams,* 296 Mass. 41, 50 (The specification of the "public good" as the standard for measuring the number of licenses is adequate). Compare *Druzik* v. *Board of Health of Haverhill,* 324 Mass. 129, 134; *Clark* v. *Board of Appeals of Newbury, ante,* 407.

The obligation to act reasonably in accordance with the statutory purpose and in a manner consistent with the public interest will be implied so far as not expressed. Davis, Administrative Law Treatise, § 2.04, makes the appropriate observation: "Nothing should hinge upon presence or absence of such vague phrases as 'public interest' or 'just and reasonable.' The substance is the same whether . . . [the legislative body] says 'deal with the problem' or says 'deal with the problem in the public interest.' "

3. The standards of the Authority, found in the express provisions of the statute as well as in the implications of these provisions, of the structure of the agency, and of the declared public purpose, are constitutionally adequate.

Section 5 (a) states that the purpose of the plaintiff is "to develop, finance and operate . . . mass transportation . . . in the public interest . . . in order to promote the general economic and social well-being of the area and of the commonwealth." The plaintiff, in consultation with other public agencies, must develop a long-range program for mass transportation (§ 5 [g]). The agencies specified are "the department of commerce and development, the metropolitan area planning council, and such other agencies of the commonwealth or of the federal government as may be concerned with the said program." The program must be based upon the plans and programs adopted by the public works commission after a submission by its bureau of

546                                      348 Mass. 538

Massachusetts Bay Transp. Authy. *v.* Boston Safe Deposit & Trust Co.

transportation planning and development under G. L. c. 16, § 3A (inserted by § 1 of the same statute [St. 1964, c. 563] that inserted c. 161A.[1])

The comprehensive plan must include estimates of costs and revenues and must be submitted for approval to the advisory board of the cities and towns (§ 5 [g]). If within thirty days after approval by the advisory board, any of the agencies specified in § 5 (g) "shall advise the authority in writing that the program is not based on the transportation plans and programs adopted by the said commission [of public works], the program shall be subject to the approval of the governor." As noted above, revisions of the program by § 5 (h) must be reported annually to the Governor, the advisory board, and the Legislature.

The statute by § 29[2] requires that all Federal assistance available to the Authority be used. Whenever Federal aid is used, Federal standards will be applicable.

The controls applicable to agreements with private companies are stated in § 3 (f).[3] Such agreements must be on

---

[1] Section 5 (g) reads in part: "Such program shall be based upon transportation plans and programs adopted by the public works commission pursuant to section five A [*sic*] of chapter sixteen . . . ." The words "five A" are obviously a misprint for "three A." The newly inserted § 3A of c. 16 provides: "There shall be in the department a bureau of transportation planning and development which shall be under the supervision and control of the commission. . . . Said bureau shall serve as the principal source of transportation planning in the commonwealth, and in so serving shall conduct research, surveys, demonstration projects and studies in co-operation with the federal government, other governmental agencies, and appropriate private organizations and be responsible for the continual preparation of comprehensive and co-ordinated transportation plans and programs for submission to and adoption by the commission and for such review or consideration by other governmental agencies as may be required by law or deemed appropriate by the commission. Said plans and programs shall be prepared in co-ordination with comprehensive urban development plans and in co-operation with the said other agencies so far as practicable."

[2] "The authority is authorized and directed from time to time to take all necessary action to secure any federal assistance which is or may become available to the commonwealth or any of its subdivisions for any of the purposes of this chapter. . . . It is the intent of this section that the provisions of any federal law, administrative regulation or practice governing federal assistance for the purposes of this chapter shall, to the extent necessary to enable the commonwealth or its subdivisions to receive such assistance and not constitutionally prohibited, override any inconsistent provisions of this chapter."

[3] "Any agreement . . . which is to be financed from the proceeds of bonds or bond anticipation notes and which provides for the rendering of transportation service by such company and for financial assistance to such company

348 Mass. 538                             547

Massachusetts Bay Transp. Authy. v. Boston Safe Deposit & Trust Co.

a year to year basis, must include standards for service, and may not provide for cash payments for service in an amount more than will permit the company a reasonable return.

Other controls in respect of "assistance to private companies" from the proceeds of bonds issued under § 23 (3) and subject to contract assistance are stated in § 28. This section requires that the Executive Office and the Authority adopt rules and regulations governing the procedures for "applying for assistance to private companies" under § 23 (3) and the use of such assistance. "Such rules and regulations shall include provisions (a) requiring any private company which receives such assistance to agree to limit its profits and its expenses for salaries and overhead so as to make available as much of its earnings as possible for repayment to the authority of such assistance; (b) requiring such repayment; (c) enabling the authority and the executive office for administration and finance to examine and audit the books and records of such company for the purpose of establishing and enforcing such limitation and repayment; and (d) requiring the authority to transfer to the commonwealth the commonwealth's share of such repayment."

The regulatory power given the Authority by § 5 (k),[4] over all private companies providing mass transportation

---

... shall include such standards for such service as the authority may deem appropriate and shall not bind the authority for a period of longer than one year from its effective date . . . [unless] subject to annual renewal or annual cancellation by the authority. Such agreements may provide for cash payments for services rendered, but not more than will permit any private company a reasonable return."

[4] "... [The] authority shall in all respects have the same powers and duties in respect to such private carriers as are provided by law for the department of public utilities except as to safety of equipment and operations . . .; and provided . . . that whenever the authority desires to add new routes for service in any area, it shall give preference in the operation of such routes to the private carrier then serving such area unless the authority concludes that such carrier has not demonstrated an ability to render such service according to the standards of the authority, that such service can be operated directly by the authority at substantially lesser expense to the authority and the public than if operated by such private carrier, or that for substantial and compelling reasons in the public interest operation by such private carrier is not feasible."

548        348 Mass. 538

Massachusetts Bay Transp. Authy. *v.* Boston Safe Deposit & Trust Co.

in the area of the. Authority, enables it to protect against the misuse of public subsidies in poor operation and management.

The act provides additional limitations on railroad aid. Thus, contracts with commuter railroads financed under § 23 (2) may only be for passenger service to and from Boston and may not extend beyond December 31, 1967. Not more than $5,000,000 of bonds nor more than $5,000,000 of State aid may be used for this purpose (§§ 23, 28 [B]).

The implicit mandate of the statute is to provide transportation when and where public convenience and necessity require it. It is not a constitutional defect that there is no requirement for express findings of such convenience and necessity, or for a record so that such findings could be judicially reviewed. There is no more occasion for judicial review of the determination of this political subdivision that transportation of a particular kind is required in a particular area than for review of the determination of a town that a certain highway is needed, or that a new school building should be built, and where it should be located. *Lynch* v. *Forbes,* 161 Mass. 302, 308 (eminent domain). See G. L. c. 71, §§ 68, 70; *New Bedford* v. *New Bedford, Woods Hole, Martha's Vineyard & Nantucket S.S. Authy.* 330 Mass. 422, 431 (the Steamship Authority has wide administrative power as to extent of service).

We think that there is no reasonable likelihood that under c. 161A public funds will be paid to a private company whose particular operations do not greatly serve the public need, so that in the particular instance the private advantage would be principally served. If such a possibility exists, however, it does not establish that the statute is unconstitutional. The Legislature has decided that contracting with private companies is an appropriate means for meeting the public need for transportation. Such contracts are incidental to the general plan. They are means for public ends, just as are the contracts for constructing school buildings and the buildings themselves when built. By contrast, the proposed statute for tax exemption of the

348 Mass. 538                                        549

Massachusetts Bay Transp. Authy. *v.* Boston Safe Deposit & Trust Co.

Prudential project which was to include a public garage and possibly some other public buildings, considered in *Opinion of the Justices,* 341 Mass. 738, 758–759, did not, "on the face of the statute," show that a predominantly public purpose would be served.

There are in the statute reasonable administrative checks and controls upon the Authority's acts in the delegation of power to other agencies.[5] There is an analogy in the statutory provisions that relate to and circumscribe public action by other political subdivisions.

If the Authority acts illegally, that is, in violation of the statute, officials or other persons having standing may act to invoke judicial review. *Horton* v. *Attorney Gen.* 269 Mass. 503, 509–510. *New Bedford* v. *New Bedford, Woods Hole, Martha's Vineyard & Nantucket S.S. Authy.* 330 Mass. 422, 431–432. The determinations of the Authority, however, as to how to exercise its powers for the declared

---

[5] Article VI, § 6, of the contract for financial (State) assistance between the Authority and the Executive Office shows how the administrative provisions of the statute are calculated to impose upon the Authority sound standards for its operations. The article calls for economical operation (§ 6.1), the filing of all relevant documents (§ 6.2) and for express findings in respect of agreements with private transportation companies (§ 6.3). These findings are: "(a) that the mass transportation service to be provided by the private company pursuant to the agreement and the granting of the assistance are necessary to carry out the purposes of Chapter 161A; (b) that the mass transportation service to be provided by the private company pursuant to the agreement could not be provided through the ordinary operation of private enterprise alone, with a reasonable return if a return is permitted by the contract, without the assistance provided by the contract; (c) that the financial plan is sound and provides no more than a reasonable return to the private company after provision for reasonable expenses of operation; and (d) that the contract includes provisions relating to the quantity and quality of service and to the rates to be charged to the public therefor which are appropriate and adequate to give reasonable assurance that the purposes of the contract will be accomplished. As to any agreement authorized prior to the making of this contract which is to be designated under Section 2.5 hereof, such findings may be made at any time prior to the designation." Also, as to railroad agreements (§ 6.4) it is provided: "No assistance to a railroad financed pursuant to paragraph (2) of Section 23 of Chapter 161A shall exceed the net cost of the mass transportation service provided pursuant to the contract determined on an avoidable cost basis for the period covered by the contract in such manner as the applicable contract may provide." All books and records of the company pertinent to the assistance granted are subject to audit. "Any such assistance which is repaid shall be remitted by the Authority to the Commonwealth in the same proportion in which the applicable assistance was paid by the Commonwealth pursuant to clause (c) of Section 2.1 hereof."

public purpose, if within the scope of the delegated power and in conformity with the express and necessarily implied statutory requirements, are not to be set aside by the courts: *Commonwealth* v. *Hudson,* 315 Mass. 335, 341–343.

B.  STANDARDS FOR ACTION BY THE EXECUTIVE OFFICE.

Section 28 authorizes contract assistance by the Commonwealth to the Authority, whereby a portion of the net cost of service shall be paid by the Commonwealth and not assessed upon the cities and towns.  The contracts for such assistance are to be made by the Executive Office.  The standards to be applied in the making of such contracts are not now directly in issue.  Nevertheless, the third condition of the contract with the banks, that is, that the Authority and the Executive Office shall have contracted for State aid, impliedly requires that such contracts be valid.  We therefore consider whether § 28, read in the context of the statute, adequately indicates the purposes of the contracts and the principles which are to guide the Executive Office in making them.

Section 28 defines the kinds of assistance which may be granted and imposes limitations upon each.  These limitations are summarized in the margin.[6]

There are general provisions in § 28 relating to contract assistance.  Debt service on indebtedness for which contract assistance is provided must mature serially beginning not later than ten years after date of issue and ending not later than forty years after the date of the bonds.  The

---

[6] (A) State aid under § 28, clause (A), is limited to the annual debt service on (1) ninety per cent of the bonds issued to acquire mass transportation facilities and certain equipment for express service (see § 23 [1]), and on (2) fifty per cent of the bonds issued to acquire mass transportation facilities and equipment to provide local service and certain related assistance payments (see § 23 [3]).  These two classes of assistance shall not exceed the debt service on more than $145,000,000 of bonds.  Clause (A) assistance for express service bonds is limited to $55,000,000, and such assistance for all purposes is limited to $60,000,000, until a program for mass transportation has been adopted (see § 5 [g]).  (B) Assistance under § 28, clause (B), is limited to a total of $5,000,000 to be paid for not more than one half the cost of agreements to provide passenger service to Boston until December 31, 1967 (§ 23 [2]).  (C) Clause (C) provides that not more than $3,000,000 annually may be paid on account of indebtedness assumed by the Authority which had been issued in respect of express service facilities, subject to detailed provisions not here relevant.

348 Mass. 538                                     551

Massachusetts Bay Transp. Authy. *v.* Boston Safe Deposit & Trust Co.

amount of each instalment of principal is regulated. "The bonds whose debt service is to receive contract assistance shall be selected in a manner which is consistent with the purposes for which the assistance is granted and which allocates the benefits of the assistance equitably. . . . Any contract under this section shall include such provisions as the executive office . . . deems necessary and desirable to assure the efficient operation of the authority and the minimum burden on the commonwealth and on the cities and towns within the authority." The provision for rules and regulations to govern assistance to private companies under § 23 (3) is summarized in part II A above.

The Executive Office, by G. L. c. 7, § 3, inserted by St. 1962, c. 757, § 4, serves "as the principal agency of the executive department of the government . . . for . . .: (1) Developing, co-ordinating, administering and controlling the financial policies and programs of the commonwealth; (2) Supervising the organization and conduct of the business affairs of the departments, commissions, offices, boards, divisions, institutions and other agencies within the executive department of the government of the commonwealth; (3) Developing new policies and programs which will improve the organization, structure, functions, economy, efficiency, procedures, services and administrative practices of all such departments, commissions, offices, boards, divisions, institutions and other agencies."

Section 28 reasonably defines the categories of projects that may have State assistance. These projects, of course, must meet the general statutory criteria which govern the Authority in its action under the statute. We have already shown that the standards for action by the Authority are adequate. The program of mass transportation contemplated by § 5 [g] will, upon adoption, be an important guide to the Executive Office. Certain dollar limitations on contract assistance will then end. Several State agencies will participate in formulating the program and it must be approved by the advisory council and, in a certain contingency, by the Governor. Chapter 7 also gives a general

direction to the Executive Office, that is, to act for sound
and wise financial administration. Chapters 161A and 7,
together, instruct the Executive Office so to perform its
part under c. 161A that that system as created will be ca-
pable of "efficient operation . . . [and, consistently there-
with, impose] the minimum burden on the commonwealth
and on the cities and towns within the authority."

The Legislature has recognized in c. 161A that each proj-
ect must be viewed in its relation to the whole statutory
purpose and that only at the time of commitment to that
project can a financially sound decision in the public in-
terest be made as to the proportion of State aid necessary
to its success without undue burden on the cities and towns
affected. This need for appraisal and decision after the
statute is enacted supports wider discretion than might
otherwise be justified. The decision of the Executive Office
will, to a limited extent, determine the division of burden
between taxpayers generally and those in the seventy-eight
cities and towns. There are, however, as shown, general
standards for that decision, and the area for discretionary
action is fixed by the limits on the total assistance that may
be rendered in the several categories.

Doubtless in exercising that discretion the Executive Of-
fice will take into account, as one of the factors appropriate
for consideration in respect of each project, the extent to
which the project will be of benefit to an area larger than
the seventy-eight cities and towns in relieving highway
congestion, and providing facilities of value to the entire
Commonwealth.

There are analogies. The Department of Public Works,
for example, within the limits of its appropriations, has
wide discretion as to the building of State highways. It
has discretion in making contributions for repairs and im-
provements of ways in small towns under G. L. c. 81, § 26.
Although the town's share, if the State contributes, is fixed
by § 26, the discretion to contribute is in the department on
such information from the selectmen as it may require (§ 27).
Further, by § 26A, the county may contribute county funds

348 Mass. 538                                              553

Massachusetts Bay Transp. Authy. v. Boston Safe Deposit & Trust Co.

in accordance with such agreements as the commissioners, the selectmen and the department may make. In the particular instance, a decision may greatly relieve local taxpayers in respect of the cost of certain ways. See also G. L. c. 90, § 34 (2) (a).

We conclude that there is adequate statutory guidance to the Executive Office for its decisions in the making of contracts of assistance under § 28.

## III.

### The Constitutional Status of the Provisions for Borrowing Money. Article 62, § 3, of the Amendments to the Constitution.

#### A. Borrowing Directly by the Commonwealth.

Section 12 requires the Commonwealth to pay the Authority at the end of each year its "net cost of service."[7] By §§ 8 to 11, a part of the net cost of service is assessed upon the seventy-eight cities and towns. See part VI below. By § 12, the State Treasurer may borrow in anticipation of these assessments and is to repay any sum borrowed "as soon after said assessments are paid as is expedient, but in any event before the close of the year in which the same were borrowed." Section 13 authorizes advances by the Commonwealth during any year on account of net cost of service. It provides that such advances may be included in the amount to be borrowed by the State Treasurer under § 12, "any such borrowing to take place in the calendar year in which the assessments under section twelve are to be made."

Article 62, § 2, of the Amendments provides that the Commonwealth may "borrow money in anticipation of re-

---

[7] Section 1 defines "net cost of service" as "the difference between (a) all income received by the authority, . . . and grants for current purposes, and (b) all current expenses incurred by the authority, including . . . debt service (including any debts, liabilities and obligations assumed under the provisions of law and including any applicable sinking fund requirements), taxes and rentals, and all other expenses which the authority determines not to capitalize, when such expenses exceed such income. Expenditures from the proceeds of bonds or bond anticipation notes shall not be included in current expenses."

ceipts from taxes or other sources, such loan to be paid out of the revenue of the year in which it is created." The banks do not contend that borrowings under § 12 are not within the authority of art. 62, § 2. See statutes noted in *Singleton* v. *Treasurer & Recr. Gen.* 340 Mass. 646, 650–651. Compare the *Singleton* case where the proposed borrowing would have been in anticipation of appropriations. It is to be noted that St. 1964, c. 563, §§ 2 and 6, amend the General Laws to make available for the purpose of affording contract assistance to the Authority under § 28 of c. 161A a portion of the revenue from the cigarette excise.

## B.  BORROWING BY THE AUTHORITY.

Section 4 of c. 161A empowers the Authority to establish units of mass transportation facilities for furnishing either express or local service and to acquire the necessary real property, facilities and equipment. The statute contemplates and authorizes the lease of these units for operation by others. The Authority may issue bonds to meet the capital expenditures (see § 23 [4]) necessary to carry out the provisions of the section. The bonds are to be paid solely from the rentals received or, if a lease is terminated, from the income from the operation of the facilities by the Authority. The term of a lease under § 4 may not exceed forty years, subject to cancellation at least once each year, and the rental must be at least sufficient to pay the bonds issued in connection with the unit leased. The bonds, being issued under the general power stated in § 23, must mature within forty years. These bonds under § 4 are, however, not subject to the limitation on dollar amount stated in § 23.

Section 12 enables the Authority temporarily to borrow money and issue notes therefor whenever it lacks sufficient cash to make payments required of it. Such borrowing is in anticipation of payments of "net cost of service" due from the State under §§ 12 or 13.

Section 23, in four numbered subsections, authorizes the Authority to issue bonds for the following purposes: (1) the acquisition of facilities and equipment for express service

348 Mass. 538                                          555

Massachusetts Bay Transp. Authy. v. Boston Safe Deposit & Trust Co.

(except rolling stock, garages, yards, and shops); (2) the financing of agreements with railroads for passenger service to and from Boston extending no later than December 31, 1967; (3) (a) the acquisition for its own use, or for lease, of facilities and equipment for local service and (b) the granting of relief to private companies injured by competition of the Authority; and (4) the payment of capital costs, including rolling stock, garages, yards, and shops. Section 23 also authorizes refunding bonds.

Section 27 of c. 161A empowers the Authority to issue notes, including bond anticipation notes. Notes may be issued for the purposes and in the amounts for which bonds may be issued.

The Commonwealth is of course not the ostensible borrower in any of the foregoing instances. There are, however, related provisions that involve the Commonwealth in the repayment of borrowings. The Commonwealth's obligation to pay the "net cost of service" appears to be the only firm assurance to holders of certain bonds of the Authority that the bonds will be paid. This assurance results from the inclusion of the debt service on bonds not otherwise provided for as an expense in computing the net cost of service.

Section 12 is to be read with § 13. Section 13, as noted above, imposes an obligation on the Commonwealth to make advances to the Authority at any time when required to put it in funds to meet its obligations. There are in § 13 specific provisions to assure lenders the aid of the courts to require that the advances needed to pay them are made. This is a "right" enforceable against the Commonwealth.[8]

---

[8] ". . . If the commonwealth shall not make such payment [of amounts due on bonds or notes, other than guaranteed notes] within a reasonable time or shall not pay when required any applicable contract assistance under section twenty-eight, the authority or any [unpaid] holder . . . shall have the right to require the commonwealth to pay the authority the amount remaining unpaid, which right shall be enforceable as a claim against the commonwealth. The authority or any such holder of an unpaid bond or note may file a petition in the superior court for Suffolk county to enforce such claim or intervene in any such proceeding already commenced and the provisions of chapter two hundred and fifty-eight shall apply . . . . Any . . . [petitioning] holder . . . may apply for an order of said court requiring the authority to apply funds received by the authority on its claim against the commonwealth to the payment of the petitioner's unpaid bond or note . . . ."

The Commonwealth, by contracts of assistance under § 28 (see part III A, *supra*) may guarantee temporary notes issued by the Authority in anticipation of bonds. By contracts of assistance also, the Commonwealth will undoubtedly be additionally and substantially committed to the payment of amounts due on certain bonds (see part II B, *supra*).

We hold that none of these provisions, nor all of them, make the Commonwealth in substance, the principal in the Authority's borrowings. The principal is the Authority; it has a substantive, independent existence, a substantial business, and substantial business income. It is the Authority that borrows and for its own independent purposes. *Opinion of the Justices,* 322 Mass. 745, 751–754. *Opinion of the Justices,* 331 Mass. 771, 777. Compare *Opinion of the Justices,* 276 Mass. 617, 621; *Opinion of the Justices,* 291 Mass. 567, 570; *Ayer v. Commissioner of Admn.* 340 Mass. 586, 590–598.

The case of *Ayer v. Commissioner of Admn.* 340 Mass. 586, 590–598, dealt with a very different situation. We there held that, although St. 1958, c. 603, authorized the Massachusetts State Office Building Association to borrow rather than the Commonwealth, in substance the borrowing was by the Commonwealth and the Association was no more than an "artifice" for the construction of the office building by the State without following the statutory procedures and safeguards for the construction of public works. We noted that (1) the only purpose of the Association was to construct the building, lease it, and eventually convey it to the Commonwealth; (2) the building was to be financed entirely from the sale of bonds which were to be paid entirely from "rentals" paid by the Commonwealth; (3) the "rentals" and the terms of the lease were fixed with reference to meeting the bond obligations and eventual conveyance was dependent upon payment of the bonds; (4) the Association had no usual landlord's duties and no independent business purposes.

That the Authority is not such an artifice is plain. It has a great and multiple task to perform for an indefinite

time.  The delegation of this relatively new aspect of the public business to an independent agency is appropriate. It is in general accordance with the precedent of the Metropolitan Transit Authority.  St. 1947, c. 544.  As noted above (part II A), the Authority has the substance that precedents indicate to be appropriate for an independent political subdivision.  The seventy-eight cities and towns have a part in choosing the directors by which the Authority is managed as well as a part in the control of its affairs. It is subjected to controls by State officers and other State agencies.

In part, the Commonwealth is the conduit for the payment, by the cities and towns directly benefited, of the deficits in the Authority's operations.  So far as the Commonwealth is committed to payments from its general funds it thus gives suitable State aid to a political subdivision in recognition of the general interest of the entire Commonwealth in efficient public transportation within its borders. Such State aid is "no more than assistance offered by the Commonwealth to the . . . [Authority] to help . . . [the Authority] in part to carry the burden assumed by . . . [it] in a public enterprise."  *Opinion of the Justices,* 322 Mass. 745, 753.  The Commonwealth is not made a principal by the action under § 28 resulting in the earmarking of certain of its contributions for particular debt service. *Ibid.  Opinion of the Justices,* 331 Mass. 771, 777.

The statutory procedures for direct action against the Commonwealth are in effect garnishment proceedings that will serve to assure bond and note holders that they will be paid.  The statute makes this explicit.  Section 13 requires that proceedings to enforce the Commonwealth's commitment be brought by the Authority or in its name and on its behalf.  The State in supplying this mechanism to make the bonds marketable is not making itself the principal on the borrowings.

We conclude, in view of the foregoing, that there is no borrowing by the Commonwealth, such that by art. 62, § 3, a vote of two thirds of each House of the General Court was required therefor.

558                                  348 Mass. 538

Massachusetts Bay Transp. Authy. *v.* Boston Safe Deposit & Trust Co.

## IV.

### Is Credit Given or Lent to Private Parties? Article 62, § 1, of the Amendments to the Constitution.

The banks concede that no pledge of credit is involved "in simply making payments of cash subsidies from general public funds." *Opinion of the Justices,* 347 Mass. 789, 790–791. The Commonwealth, however, in the respects already noted may be called upon to act under c. 161A so as to assure or facilitate payments due from the Authority. Some of the borrowings made by the Authority may be used to aid private transportation companies. These companies, as the banks point out, form a small and narrowly defined class.

None of these provisions and no action under them conflict with the constitutional prohibition against the lending or giving the credit of the Commonwealth "in aid of any individual, or of any private association, or of any corporation which is privately owned or managed." As we have shown, the aid given is to the Authority in its independent business operated in the public interest. No aid is given or lent to any other person or agency. The benefit to others is indirect and incidental and not the purpose of the statute. *Allydonn Realty Corp.* v. *Holyoke Housing Authy.* 304 Mass. 288. *Opinion of the Justices,* 322 Mass. 745, 751.

## V.

### The Effect of the Constitutional Amendment of November 3, 1964.

Article 62, § 1, now provides: "The Commonwealth may give, loan or pledge its credit only by a vote, taken by the yeas and nays, of two-thirds of each house of the general court present and voting thereon." Plainly, so far as any pledge of the Commonwealth's credit is *made by the Legislature* after November 3, 1964, a two-thirds vote is required.

The legislative function in respect of credit under c. 161A was complete when the bill was enacted. True, prior to November 3, 1964, no specific action had been taken under

348 Mass. 538 559

Massachusetts Bay Transp. Authy. v. Boston Safe Deposit & Trust Co.

the statute in connection with which the Commonwealth's credit was pledged. The authority to take such action, however, had been given. Article 62, § 1, does not say that action to affix the Commonwealth's credit to a specific obligation is barred unless the legislative authority, although valid when enacted, was given by two-thirds votes. The language of the amendment, in saying that the only way that the credit can be pledged *is by legislative action,* excludes the later carrying out of the pledge from the constitutional concept of the pledge itself. The enactment of the statute was the pledge of the Commonwealth's credit within the meaning of the article. The Justices, speaking of a proposed bill to bind the Commonwealth's credit, unconstitutionally, to a private corporation to build a bridge to Hull, said: "The credit of the Commonwealth is given or loaned the moment the bill takes effect. That credit as matter of common knowledge cannot fail to be an influential, favorable factor in the sale of the obligations of the corporation whenever issued." *Opinion of the Justices,* 276 Mass. 617, 622.

The Authority is right in its contention that the amendment is a regulation of the legislative process. Such an amendment does not necessarily invalidate prior laws. *Norton* v. *Board of Commrs. of the Taxing Dist. of Brownsville,* 129 U. S. 479, 490. "A provision of the Constitution commonly is to be interpreted as stating a broad and general principle of government, regulative of all conditions arising in the future and falling within its terms." *Opinion of the Justices,* 261 Mass. 523, 543–544. For the general rule that statutes that affect substantive rights operate prospectively see *Lindberg* v. *State Tax Commn.* 335 Mass. 141, 143; *Brucato* v. *Lawrence,* 338 Mass. 612, 617; *Welch* v. *Mayor of Taunton,* 343 Mass. 485, 487–488.

The rule that the repeal of statutes that create liabilities destroys rights based on the statutes does not present an analogy. See *Mayor & Aldermen of Taunton, petitioners,* 290 Mass. 118, 124–125; *Pittsley* v. *David,* 298 Mass. 552, 555–557; *United States* v. *Chambers,* 291 U. S. 217, 226.

See also *Bell* v. *Maryland*, 378 U. S. 226; *Hamm* v. *Rock Hill*, 379 U. S. 306. We think there can be no doubt that the Legislature and the people in adopting the amendment of November 3, 1964, understood that they were making a change in the legislative process effective for the future. We believe there was no intent to halt or impede the continued financing of established projects involving the pledge of the Commonwealth's credit voted by the Legislature prior to the amendment and hence without reference to the two-thirds vote requirement.[9]

## VI.

### THE PROVISIONS FOR THE APPORTIONMENT OF NET TRANSPORTATION COSTS.

The Commonwealth, if at the end of any year it is called upon to pay over to the Authority an amount representing the Authority's net cost of service for that year, will assess that amount, reduced by State aid, if any, upon the cities and towns. Section 8 provides that that part of the net cost of service which arises from express service is assessed by two computations. Seventy-five per cent is assessed upon the cities and towns according to the proportion that the number of commuters in each bears to the total number of commuters in the area; twenty-five per cent is assessed to those cities and towns having express stations according to the proportional number of riders boarding at such stations.

Section 10 (for the fourteen cities and towns beginning in 1976) and § 11 (for the sixty-four cities and towns be-

---

[9] The Commonwealth is authorized to guarantee the bonds and notes of housing authorities and to make contributions thereto. See G. L. c. 121, § 26NN (veterans' housing — guaranty and contributions); § 26RR (relocation housing — guaranty); § 26VV (housing for elderly persons of low income — guaranty and contributions); § 26JJJ (housing rehabilitation — guaranty). Statute 1960, c. 701, § 9, provides for an annual payment to the Woods Hole, Martha's Vineyard and Nantucket Steamship Authority (assessable to three municipalities and the county of Dukes county) when the Authority's income and reserve fund are insufficient to meet its cost of service. Debt service is includible in determining its cost of service. Under St. 1964, c. 703, § 10, the Commonwealth may guarantee the bonds and notes of the Southeastern Massachusetts Technological Institute Building Authority.

348 Mass. 538                                              561

Massachusetts Bay Transp. Authy. *v.* Boston Safe Deposit & Trust Co.

ginning in 1966) provide that that part of the net cost of service which arises from local service is assessed upon each city and town one half based upon its proportion of the population of the assessed area and one half according to the proportion which the net loss in each city or town bears to the net loss on all routes. By § 9, from 1966 through 1975, the fourteen cities and towns are assessed for local service in accordance with a combination of two factors; one based upon the "prior method of assessment,"[10] the other based upon the proportional net loss attributable to each of the fourteen municipalities. In each of the ten years the percentage of assessment based upon the prior method is reduced by five per cent and the percentage based upon loss attributable to routes is correspondingly increased so that in 1975 the apportionment is fifty per cent by each method.

"Commuters," by § 1, are "all persons whose place of work is in the city of Boston or the city of Cambridge and whose residence is in one of the fourteen cities or towns or one of the sixty-four cities or towns, regardless of the means of transport of such persons to and from their places of work."

We assume that a number of commuters do not use express service. The banks point out that some persons within the definition of "commuters" may live so close to their places of work that they are not commuters in the common sense. Even so, we think the proportional number of commuters is a reasonable basis of apportionment. Express service is related to all other means by which people move about. Those who travel every day between home and work burden all transportation facilities; their number is an appropriate measure of the benefit to their community of express service. The presence of such service as an alternative to the use of private automobiles greatly relieves highway use so that those who do not themselves use such service are benefited.

---

[10] See St. 1948, c. 344, for method of assessing Metropolitan Transit Authority deficits.

562 ‹ 348 Mass. 538

Massachusetts Bay Transp. Authy. *v.* Boston Safe Deposit & Trust Co.

It is also reasonable to apportion twenty-five per cent of the cost of express service in relation to the number of riders boarding at express service stations in the municipality. True, the number of riders boarding in Cambridge, for example, is not numerically related to the number of Cambridge taxpayers using the facilities. The city, however, is benefited by a transportation system that moves in tunnels or reserved areas commuters who must pass through the city by some means.

We discern nothing arbitrary in the assessment of the costs of local service. The basis of apportionment of losses to population and to routes is the general benefit to all inhabitants of an efficient public transportation system. The provision for a ten year period for gradual shift of loss computations for the fourteen cities and towns from the present method to the new method appears a suitable means of accomplishing a reasonable change.

Apportionment of costs of debt service on a different basis for the fourteen cities and towns from that applicable to the sixty-four cities and towns is reasonable. It leaves the burden of preëxisting debt where it was when originally incurred.

By any measuring and apportioning schemes that can feasibly be administered, only a rough approximation of equality in the distribution of burdens can be had. Other deviations from an ideal apportionment plan, in addition to those noted, of course exist. They do not, however, render the apportionment invalid. The cost and complexity of refinements justify the legislative decision to avoid them.

"It is not essential that the burdens of taxation should be imposed upon cities and towns in proportion to the benefits received by each from the expenditure of the money raised . . . . [E]xpenses have been apportioned not only 'with reference to all the circumstances of benefit to the respective municipalities affected' but also with reference 'to their population, extent, and ability to bear the burden.' . . . [E]xpenses . . . have been apportioned according to the valuation of the several municipalities and according to

percentages derived from combinations of valuation and population and upon other bases." *Opinion of the Justices,* 234 Mass. 612, 620. See *Attorney Gen.* v. *Williams,* 174 Mass. 476, 481; *Boston* v. *Treasurer & Recr. Gen.* 237 Mass. 403, 420–421; *Horrigan* v. *Mayor of Pittsfield,* 298 Mass. 492, 499. There is nothing in the apportionment provisions of c. 161A, which is "arbitrary, despotic, or . . . a flagrant misuse of legislative power." *County of Essex* v. *Newburyport,* 254 Mass. 232, 238.

## VII.

A decree is to enter in the county court declaring the construction of the statute and resolving the controversies presented in accord with the foregoing, and declaring that the banks are obligated by the purchase and sale agreement of December 31, 1964.

*So ordered.*