# OPINIONS OF THE JUSTICES.

## OPINION OF THE JUSTICES TO THE SENATE.

*Railroad. Constitutional Law,* Credit of the Commonwealth, Use of public money or property. *General Court. Commonwealth,* Financial matters.

A bill pending before the Senate containing an authorization to expend bond proceeds for the improvement of publicly and privately owned rail lines in the Commonwealth through the modification of clearances and grade crossings, whereby the Commonwealth would be neither guaranteeing private loans nor loaning borrowed money to the railroad lines, would not, if enacted, violate art. 62, § 1, of the Amendments to the Massachusetts Constitution. [1206-1208, 1210]

The provisions of a bill pending before the Senate, authorizing the Commonwealth to raise bond revenue and to expend those funds for the improvement of publicly and privately owned rail lines in the Commonwealth, if enacted, would provide sufficient guidance to the secretary of the executive office of transportation and construction to carry out the clear expression of Legislative policy and purpose, and do not constitute an improper delegation of Legislative authority. [1208-1210]

On January 31, 1996, the Justices submitted the following answers to questions propounded to them by the Senate.

To the Honorable the Senate of the Commonwealth of Massachusetts:

The Justices of the Supreme Judicial Court respectfully submit their answers to the questions set forth in an order adopted by the Senate on October 26, 1995, and transmitted to this court on October 27, 1995. The order indicates that there is pending before the Senate a bill entitled "An Act relative to providing financial assistance to certain railroads," printed as Senate Bill No. 2073. A copy of the bill was transmitted with the order.

The order recites in part: "The bill contains an authorization to expend bond proceeds for the modification of clearances over certain railroad lines and of grade crossings to improve rail capacity and access over certain freight railways in the commonwealth, including but not limited to the

modification of rail grades, overhead highways and bridge grades, to certain freight rail lines in the commonwealth necessary to achieve clearance for double stack trains to at least twenty feet eight inches above the top of the rail. . . ." The order states that the bill also would authorize the expenditure of bond proceeds for:

> "the design, study, preparation of plans, if necessary, for safety improvements along the Fitchburg division of the Boston and Maine railroad in North Cambridge; and

> " . . . the construction, reconstruction, repairs and other improvements to railroad facilities at Gloucester Harbor; and

> " . . . the design, preparation of plans, if necessary, and for construction, reconstruction, repairs or other improvements to the railroad beds and the railroad lines leading to the waterfront of Fall River."

The order says that "[t]o meet these expenditures, the bill provides that the state treasurer shall, upon request of the governor, issue and sell bonds of the commonwealth and that the state treasurer may borrow from time to time on the credit of the commonwealth sums of money as may be necessary for the purpose of meeting payments authorized in said items. . . ."

The order also says that grave doubt exists as to the constitutionality of the bill, if enacted, and requests our opinion on these questions:

> "1. If the provisions of item 6000-7967 of section two of Senate Bill No. 2073 are enacted into law, would the issuance of bonds of the commonwealth and the authorization to use the proceeds thereof to modify the clearances and grade crossings over certain railroad lines to improve rail capacity and access in accordance with the provisions of section eight of said Senate Bill No. 2073, violate the provision of section 1 of article sixty-two of the Amendments to the Massachusetts Constitution that the credit of the commonwealth shall not in any manner be given or loaned to or in aid of any individual, or of

any private association, or of any corporation which is privately owned and managed?

"2. If the provisions of items 6000-7969, 6000-8968 and 6000-8969 in section 3 of Senate Bill No. 2073 are enacted into law, would the issuance of bonds of the commonwealth and the authorization to use the proceeds thereof for the purposes of said items, including but not limited to safety improvements, construction and reconstruction to railroad facilities and for the improvements to railroad beds and railroad lines violate the provisions of section 1 of article sixty-two of the Amendments to the Massachusetts Constitution that the credit of the commonwealth shall not in any manner be given or loaned to or in aid of any individual, or of any private association, or of any corporation which is privately owned and managed?

"3. If Senate Bill No. 2073 is enacted into law, would section eight of the bill provide sufficient guidance to the secretary to determine the allocation of cost items within the master agreement?

"4. If Senate Bill No. 2073 is enacted into law, would section eight of the bill provide sufficient guidance to the secretary [of the executive office of transportation and construction] to determine whether any other railroad lines necessarily should be included in the double stack network?

"5. If enacted into law, would the provisions of subsection (d) of section eight of Senate Bill No. 2073 requiring the commonwealth and the Massachusetts Port Authority to fully fund vertical clearance improvements, as defined in subsection (a) of said section eight, including changes to rail grades, on the Consolidated Rail Corporation from the western line of the city of Framingham easterly to the existing intermodal facility at Beacon Park yard, violate the provisions of section 1 of article sixty-two of the Amendments to the Massachusetts Constitution that the credit of the commonwealth shall not in any manner be given or loaned

to or in aid of any individual, or of any private association, or of any corporation which is privately owned and managed?

"6. With reference to public bridges, may borrowed funds be expended in accordance with section eight of Senate Bill No. 2073 for modifications to such bridges over railways for the purpose of making improvements to allow private railroads to operate double-stacked trains thereon and to stimulate economic growth and expansion in the commonwealth and to promote the use of the port of Boston without violating the provisions of section 1 of article sixty-two of the Amendments to the Massachusetts Constitution that the credit of the commonwealth shall not in any manner be given or loaned to or in aid of any individual, or of any private association, or of any corporation which is privately owned and managed?"

We invited interested persons and organizations to file briefs on or before November 27, 1995. We acknowledge the assistance of a brief from the Governor of the Commonwealth, which was the only brief we received.

Article 62, § 1, as amended by art. 84, of the Amendments to the Massachusetts Constitution provides:

"The commonwealth may give, loan or pledge its credit only by a vote, taken by the yeas and nays, of two-thirds of each house of the general court present and voting thereon. The credit of the commonwealth shall not in any manner be given or loaned to or in aid of any individual, or of any private association, or of any corporation which is privately owned and managed."

Questions 1, 2, 5, and 6 ask whether the actions contemplated by Senate Bill No. 2073 would violate the second sentence of art. 62, § 1. The preamble of Senate Bill No. 2073 states that the purpose of the proposed Act "is to immediately provide financial assistance to certain railroads," and § 1 declares that the object of the legislation is "[t]o provide for a capital outlay program of improvement of freight rail access to seaports and other locations within the

commonwealth, through the preparation of plans, studies, construction, alteration, and improvement of various state, municipal and other properties, for the purpose of improving the economy and infrastructure of the commonwealth . . . ." In addition, § 8 (*a*) of the bill provides: "[I]t is hereby declared that the public necessity and convenience require that vertical clearances on the Massachusetts double stack network shall be increased to at least twenty feet, eight inches above top of rail in accordance with the provisions of this section. It is the intention of this act to stimulate economic growth and expansion in the commonwealth and to promote the use of the port of Boston."

Senate Bill No. 2073, § 8 (*b*) (1) - (4), establishes a "double stack network" of railroad lines in the Commonwealth. Section 8 creates two categories of lines which make up the double stack network; "partnership" lines, which the Governor's brief tells us are owned by rail freight companies, although the bridges are owned by the Commonwealth, and "fully funded" lines, which the brief informs us are owned by the Commonwealth except that Worcester to Framingham and Gardner to Fitchburg segments are owned by rail freight companies. All bridges over the fully funded lines are owned by the Commonwealth. Pursuant to § 8 (*e*) (1)-(3) of the bill, improvements to partnership lines are to be funded fifty per cent by the railroads and fifty per cent by the Commonwealth up to stated maximum Commonwealth payments. The costs of improvements to the fully funded lines, however, are eligible for one hundred per cent funding by the Commonwealth except that "of the cost of the vertical clearance improvements on the Conrail line from the western line of the city of Framingham easterly to the existing intermodal facility at Beacon Park Yard, one-half shall be paid by the commonwealth and one-half shall be paid by the Massachusetts port authority." § 8 (*d*).

Section 8 (*g*) provides that "[t]o accomplish the objectives of public investment in fully funded lines, the secretary [of the executive office of transportation and construction] (§ 8 [*a*]) shall require payment by a participating railroad of a reimbursement charge [with certain exceptions]. The reimbursement charge shall apply to all containers [with the aforementioned exceptions] that are transported by a double stack train over a fully funded line. . . ." The reimbursement

charge is $350 "per container," § 8 (a), and applies only to containers in excess of a number arrived at by application of a formula provided in § 8 (g). "Reimbursement charges shall be paid by the railroad handling reimbursement containers and shall be in effect for a period of fifteen years from the date of completion of vertical clearance improvement on the particular route, segment or line, or until fifty per cent of the commonwealth's investment in fully funded lines has been recovered by the payment of reimbursement charges by the appropriate participating railroad . . . ." *Id.*

Section 8 (h) provides that, before expending any of the Commonwealth's funds on the partnership or fully funded lines, the secretary is to enter into "master agreements" with the participating railroads. Each master agreement must contain, among other things, the following provisions: provisions to ensure that one railroad does not gain a competitive advantage due to the sequence of double-stack improvements, terms and conditions of the Commonwealth's reimbursement to the railroad for construction costs expended by the railroad, and terms and conditions of payment of the participating railroads' contribution.

Finally, in addition to funding the double-stack network, Senate Bill No. 2073, in § 3, provides the following funding: $500,000 for plans for safety improvements along the Fitchburg division of the Boston and Maine Railroad in North Cambridge, $1,000,000 for construction or other improvements to railroad facilities at Gloucester Harbor, and $3,000,000 for construction or other improvements to the railroad lines leading to the Fall River waterfront. To fund these improvements, §§ 6 and 7 of the bill authorize the State Treasurer to sell, at the request of the Governor, general obligation bonds.

Section 2 of Senate Bill No. 2073 anticipates the issuance of general obligation bonds to finance the improvements required to establish the double-stack network. Question 1 asks whether the issuance of bonds and the authorization to use the proceeds thereof to pay for the improvements required to establish the double-stack network violates art. 62, § 1, of the Amendments to the Massachusetts Constitution. The question requires us to construe the second sentence of art. 62, § 1: "The credit of the commonwealth shall not in any manner be given or loaned to or in aid of any individual, or

of any private association, or of any corporation which is privately owned and managed." A party's guaranty of a loan to another is a gift or loan of credit. Article 62, § 1, forbids the Commonwealth to guaranty a loan to a private party. See *Opinion of the Justices*, 359 Mass. 769, 773 (1971). Article 62, § 1, also prohibits the Commonwealth from borrowing money by the sale of bonds or otherwise, and then loaning that money to a private borrower. "The two steps of (a) borrowing by the State and (b) lending of the borrowed cash to a private borrower, would have essentially the same effect as a State guaranty of a loan to an ultimate borrower. Such a guaranty would be a violation of art. 62. To treat the arrangement [borrowing and then loaning the proceeds] differently would be to emphasize form rather than substance." *Id.*

Pursuant to art. 62, § 1, the Commonwealth may not enable a private party to borrow money for any purpose, public or otherwise, by making the Commonwealth's borrowing ability available to that party. However, art. 62 does not prohibit the Commonwealth's raising of revenue through bond sales and the expenditure of those funds to purchase public benefits from private entities. *Opinion of the Justices*, 368 Mass. 880, 887 (1975). *Opinion of the Justices*, 359 Mass. 769, 774 (1971). *Opinion of the Justices*, 337 Mass. 800, 807-808 (1958).

Senate Bill No. 2073, § 8 (*e*) (1)-(3), requires, as to the partnership lines, that the Commonwealth pay half the costs, subject to stated maximums, of improving the participating railroads' rail lines to allow passage of double-stack trains. By making such payments relative to the partnership lines, the Commonwealth would be neither guaranteeing private loans nor loaning borrowed money to the railroads. It would simply be purchasing benefits and paying for them.

The Commonwealth's proposed payments for improving the fully funded lines to allow passage of double-stack trains, like the payments to improve the partnership lines, do not violate art. 62, § 1. The payments would not constitute Commonwealth loans to the railroads made possible by the Commonwealth's issuance of bonds, but instead would be allowable direct payments for benefits. The $350 per container reimbursement charges that a participating railroad might be required to pay pursuant to the formula set forth in the bill for containers carried over fully funded lines in double-stack

trains do not constitute repayments of loans. The charges do not transform the Commonwealth's expenditures into loans to the railroads. The usual indicia of a loan, such as certainty of repayment on or before a specified date of a definite amount of money, most often with interest, are not present. We conclude that the per container reimbursement charges would be fees imposed on the users of rail lines provided by the Commonwealth. We answer question 1, "No."

Question 2 asks whether art. 62,§ 1, would be violated if the provisions of §§ 3, 6, and 7 of the bill are enacted into law. Those sections provide for the issuance of bonds and the use of the proceeds for designated activities, including, but not limited to, "the design, study, and preparation of plans, if necessary, for safety improvements along the Fitchburg division of the Boston and Maine railroad in North Cambridge"; "the design, preparation of plans if necessary [ ] and for construction, reconstruction, repairs and other improvements to railroad facilities at Gloucester Harbor"; and, similar projects involving "the railroad beds and . . . lines leading to the waterfront of Fall River." Article 62, § 1, as we have said, does not prohibit the Commonwealth's selling bonds and using the proceeds to improve publicly or privately owned rail lines, but only prohibits the Commonwealth from enabling railroads or other private parties to borrow money on the strength of the Commonwealth's credit, a result not contemplated by §§ 3, 6, and 7. Sections 3, 6, and 7 would authorize only the quid pro quo purchase of benefits for a purpose that is presumably public[1] and therefore those appropriations do not run afoul of art. 62, § 1. We answer question 2, "No."

Questions 3 and 4 ask whether § 8 provides sufficient guidance so the Secretary may determine (a) "the allocation of cost-items within the master agreement," and (b) "whether any other railroad lines necessarily should be included in the double stack network."

Before examining those questions we set out the framework

---

[1]The Commonwealth may not utilize public funds for other than a public purpose. Article 10 of the Massachusetts Declaration of Rights. *Opinion of the Justices,* 337 Mass. 800, 804 (1958). The Senate has not asked our opinion concerning whether the appropriations in Senate Bill No. 2073 are for a public purpose. Therefore, we neither express nor imply any opinion in that regard.

for our analysis: "Provided that the policy and purpose of the Legislature are clearly expressed, the absence of detailed standards in the legislation itself will not necessarily render it invalid as an unlawful delegation of legislative authority. The standards for action to carry out a declared legislative policy may be found not only in the express provisions of an act but also in its necessary implications. The purpose, to a substantial degree, sets the standards. A detailed specification of standards is not required. The Legislature may delegate to a board or officer the working out of the details of a policy adopted by the Legislature.' *Massachusetts Bay Transp. Auth.* v. *Boston Safe Deposit & Trust Co.*, 348 Mass. 538, 544 (1965). . . .

"No formula exists for determining whether a delegation of legislative authority is 'proper' or not. Here, in order to make that determination, we undertake a threefold analysis: (1) Did the Legislature delegate the making of fundamental policy decisions, rather than just the implementation of legislatively determined policy; (2) does the act provide adequate direction for implementation, either in the form of statutory standards or, if the local authority is to develop the standards, sufficient guidance to enable it to do so; and (3) does the act provide safeguards such that abuses of discretion can be controlled?" *Chelmsford Trailer Park, Inc.* v. *Chelmsford*, 393 Mass. 186, 190 (1984).

Sections 8 (*a*) and (*h*) provide that the Secretary shall enter into master agreements to finance and effectuate the improvements. The Department of Highways (department) shall report to the Secretary its findings regarding the most appropriate and cost-effective means of achieving the vertical clearance improvements, and the department's recommendations shall set forth the budget for the work, § 8 (*c*); fully funded lines are identified, § 8 (*d*); public-private funding formulas for the identified partnership lines, to include maximum Commonwealth contributions and provision for paying cost overruns are specified, § 8 (*e*); federally funded projects are accounted for, § 8 (*f*); reimbursement charges are discussed in significant detail, § 8 (*g*); and the contents of the master agreements, including financing topics are designated, § 8 (*h*), especially (2)-(7) and (10).

Those factors and their necessary implications, when coupled with the clear expression of the Legislature's policy and purpose, provide sufficient guidance for the Secretary to

determine the allocation of cost items. We answer question 3 in the affirmative.

Section 8 (*b*) authorizes the Secretary to include other lines in the network "based on an evaluation of market needs, engineering feasibility, cost, the availability of funds and financial commitments from the railroad owning or operating such lines." We also conclude that this section provides sufficient guidance, and answer question 4 in the affirmative. We answer question 3, "Yes," and question 4, "Yes."

Question 5 asks whether "the provisions of subsection (*d*) of § 8 of Senate Bill No. 2073 requiring the commonwealth and the Massachusetts Port Authority to fully fund" certain improvements, "including changes to rail grades, on the Consolidated Rail Corporation from the western line of . . . Framingham easterly to the . . . intermodal facility at Beacon Park yard," violate the second sentence of art. 62, § 1.

The Governor's brief informs us that "this portion of the rail line is owned by the [Massachusetts Bay Transportation Authority], a public agency." Our discussion of Question 1 indicates that the Commonwealth may apply borrowed funds to the making of such improvements without violating the art. 62 prohibition at issue. Assuming that art. 62, § 1, is applicable to the Massachusetts Port Authority, its sharing in the costs, as specified in § 8 (*d*), would not violate that constitutional provision. See *Opinion of the Justices*, 334 Mass. 721, 731, 742 (1956). We answer Question 5, "No."

Question 6 asks whether borrowed funds may be expended, in accordance with § 8, to modify certain public bridges over (private) railways without violating the constitutional provision at issue. The Governor informs us that "all bridges over the tracks of the Double Stack Network are owned by the Commonwealth." For reasons expressed earlier, we do not consider the Commonwealth's financing, in whole or in part, of modifications to Commonwealth bridges to be violative of the provision.

For the reasons set forth above, we answer Questions 1, 2, and 5, "No," and Questions 3, 4, and 6, "Yes."

The foregoing answers and opinion are submitted by the

Chief Justice and the Associate Justices subscribing hereto on the 31st day of January, 1996.

PAUL J. LIACOS

HERBERT P. WILKINS

RUTH I. ABRAMS

NEIL L. LYNCH

FRANCIS P. O'CONNOR

JOHN M. GREANEY

CHARLES FRIED