OPINION OF THE JUSTICES TO THE HOUSE OF REPRESENTATIVES.

*Taxation,* Excise. *Constitutional Law,* Public purpose, Expenditure of pub-
    lic money, Borrowing by Commonwealth, Credit of Commonwealth,
    Delegation of powers, Separation of powers, Appropriation of money,
    Money received on account of the Commonwealth. *Commonwealth,*
    Financial matters, Massachusetts Development Bank. *Treasurer and
    Receiver General.*

An "infrastructure development assessment," as described in a pending bill,
    which would be imposed on all corporations subject to taxation under
    G. L. c. 63, would operate as a corporate excise and thus constitute a
    tax as this court has defined the term. [1216-1217]
The Legislature, by enacting proposed legislation, may constitutionally im-
    pose a corporate excise tax for the purpose of funding a Massachusetts
    Development Bank, "a body politic and corporate and a public instrumen-
    tality," which would provide financial assistance for certain capital im-
    provement projects undertaken by public agencies and governmental
    units; any incidental benefits received by the holders of debt obligations
    of the bank, as the result of security provisions to the proposed act
    designed in the main to increase the marketability of these obligations,
    would not render the legislation constitutionally infirm. [1217-1219]
Proposed legislation to establish a corporate excise tax (infrastructure de-
    velopment assessment) and designed to maintain an annual income from
    the assessment of $145 million was not rendered constitutionally infirm
    by provisions delegating to the Commissioner of Revenue the power to
    adjust rates of assessment, in accordance with detailed instructions set
    out in the bill, for the purpose of maintaining this level of income.
    [1219-1220]
Proposed legislation which, as part of a comprehensive plan to provide
    financial assistance for certain capital improvement projects undertaken
    by public agencies and governmental units, would impose a corporate
    excise tax, and which provide (a) that the income from the tax would
    be impressed with a trust to secure the debt obligations of a proposed
    Massachusetts Development Bank, a public instrumentality with a spe-
    cifically defined public purpose, and (b) that such income could be
    expended by the bank only in accordance with specific legislative condi-

tions, did not offend the requirements of art. 63 of the Amendments to the Constitution of the Commonwealth that all money received on account of the Commonwealth be paid into the treasury thereof and be subject to prescribed appropriation procedures. [1220-1225]

It would be constitutionally permissible for the Legislature to designate the State Treasurer as the custodian of the proceeds of debt obligations issued by a public instrumentality created as part of a comprehensive plan to provide financial assistance for capital improvement projects undertaken by public agencies and governmental units, and, as these funds would not be received on account of the Commonwealth, the requirements of art. 63 of the Amendments to the Massachusetts Constitution would have no application. [1225-1226]

A delegation of powers to the Commissioner of Revenue, as set forth in proposed legislation amending G. L. c. 63, § 42, with respect to the selection of a method of determining the amount of income a corporation derives from business carried on in Massachusetts, did not offend either art. 30 of the Declaration of Rights or Part II, c. 1, § 1, art. 4, of the Constitution of the Commonwealth. [1226-1228]

Debt obligations issued by a proposed Massachusetts Development Bank, under provisions of a legislative bill creating the bank as part of a comprehensive plan for financial assistance to public agencies and governmental units, would not constitute debt of the Commonwealth within the meaning of art. 62 of the Massachusetts Constitution, in view of detailed and specific provisions in the bill demonstrating the bank's substantive existence independent of the Commonwealth. [1228-1231]

A legislative declaration of intent to appropriate money to secure the debt obligations of a proposed Massachusetts Development Bank would be without binding effect and, if enacted, would not constitute a pledge of the Commonwealth's credit. [1231]

Where a proposed act contained provisions committing the Commonwealth to devote certain identified revenue to securing the payment of debt obligations issued by the Massachusetts Development Bank, "a body corporate and politic and a public instrumentality" to be established under the same proposed act, these provisions would, if enacted, result in a pledge of the Commonwealth's credit upon the Legislature's approval of the bank's first issue of debt obligations. [1232-1233]

On November 28, 1984, the Justices submitted the following answers to questions propounded to them by the House of Representatives.

To the Honorable the House of Representatives of the Commonwealth of Massachusetts:

The undersigned Justices of the Supreme Judicial Court respectfully submit these answers to the questions set forth in an order adopted by the House of Representatives on October 2, 1984, and transmitted to us on October 3, 1984. The order recites that there is pending before the General Court a bill, House No. 6140, entitled, "An Act establishing Massachusetts development bank and providing revenue sources therefor." A copy of the bill was transmitted with the order.

We summarize the bill, leaving a more detailed description of the provisions involved to our responses to the questions. At the outset, the bill declares that there is an urgent need to repair, rehabilitate, and replace unsafe and outmoded highways, bridges, tunnels, transportation systems, and "other elements of such structures, facilities and systems as are vital parts of the physical plant of the commonwealth and provide essential support to the economic well-being and quality of life of the commonwealth." § 1 (a).[1] The bill further declares that the Commonwealth and governmental units within it (including municipalities) are unable to undertake these infrastructure projects. § 1 (b) (c). Thus, new revenues and new financing mechanisms are needed.

To meet these and related needs, the bill would create "a body corporate and politic" to be known as the "Massachusetts Development Bank" (Mass/Bank). §§ 1 (h) and 4. Its purpose would be to promote and provide financing assistance to governmental units to achieve the objectives of the bill. § 4. Mass/Bank would be able to provide or obtain the capital needed for the infrastructure projects through the issuance of debt obligations and by the receipt of funds from the Federal government, the Commonwealth, and other sources. § 1 (h). To meet

---

[1] Section 1 (a) provides in full: "It is hereby found that there is an urgent need to reconstruct, rehabilitate, repair and replace unsafe, outmoded, inadequate and deteriorating highways, roads, alleys, bridges, tunnels, parking facilities, sidewalks, traffic control devices, mass transit and other transportation systems, recycling facilities, resource recovery systems, waste water treatment and disposal systems, water supply systems, solid and hazardous waste disposal systems and other elements of such structures, facilities and systems as are vital parts of the physical plant of the commonwealth and provide essential support to the economic well-being and quality of life of the commonwealth."

its public responsibilities, Mass/Bank would have extensive powers. It would be empowered and obligated to provide financing assistance to participating agencies and governmental units, to monitor the progress of infrastructure projects and programs (one or more State projects), and "[t]o do any and all things necessary or convenient to carry out its purposes and exercise the powers given and granted in this act." § 6.

The bill would establish procedures for Mass/Bank and participating agencies and governmental units to follow in connection with providing financing assistance.

With regard to State infrastructure projects and programs, the participating agency would have to obtain approval of the secretary of the executive office in which the agency is located. § 7 (b). Thereafter, the Secretary of Administration would decide whether financing should come from Mass/Bank or through sale of debt obligations of the Commonwealth. § 7 (c). If financing is to come from Mass/Bank, it would be authorized to issue debt obligations but only after obtaining authorization by a vote of two-thirds of the members of each house of the General Court present and voting. §§ 6 (k) and 7 (d). On receipt of the proceeds of the debt obligations, Mass/Bank would have to transfer the funds to the State Infrastructure Fund, and the State Treasurer then would be required to transfer to the treasury the amount necessary to repay expenditures for the State infrastructure project or program. § 7 (e).

The procedure is somewhat different with respect to local or municipal projects. The governmental unit authorizing the financing of such a project would have to apply for financing assistance to the Secretary of Communities and Development, the Secretary of Administration, and Mass/Bank. § 8 (a). In order to approve financing assistance, Mass/Bank would be required to find, among other things, that: the financing and the project are in compliance with the purpose of Mass/Bank and the requirements of the act; all necessary approvals have been received; the project will be a public benefit; and it will not provide benefits to private persons (except incidentally). § 8 (e).

Mass/Bank would be required to evaluate the general and financial condition of State infrastructure projects and programs

annually and to file a report regarding the general condition of all projects and programs with the Governor and the General Court. § 9.

The bill prescribes in great detail the rights and obligations of Mass/Bank with respect to the issuance of debt obligations and the use of proceeds received therefrom. § 10. Mass/Bank would be authorized to issue debt obligations to pay project costs, to pay interest on debt obligations, to establish reserve funds to secure debt obligations, to buy debt obligations of cities and towns, and to pay the expenses necessary to implement its purposes. § 10 (*a*). To secure the payment of debt obligations, Mass/Bank would be empowered to create debt service reserve funds, to be funded by the proceeds of the sale of debt obligations, by State appropriations, and by other money available to Mass/Bank for the purpose. § 10 (*c*). Mass/Bank would be required to maintain such funds at the minimum level fixed by the act. If the level falls below the minimum, the Secretary of Administration, upon certification from Mass/Bank of the amount needed to restore the fund to the proper level, would be required to request an appropriation of the amount necessary from the General Court, which, however, would be under no obligation to appropriate the funds. Mass/Bank would be obligated to repay any funds so appropriated. § 10 (*c*). The proceeds of any debt obligations issued by Mass/Bank "shall be used solely for the purposes for which said debt obligations are issued." § 10 (*a*).

The bill proclaims that the act shall not constitute a debt or a pledge of the faith and credit of the Commonwealth or any of its political subdivisions. It further declares that debt obligations issued by Mass/Bank shall not constitute a debt or a pledge of the faith and credit of the Commonwealth or any of its political subdivisions, except as provided in the act, and shall be payable solely from funds available for the purpose. § 11.

The bill would insert into the General Laws a new c. 63D, which would impose on all business corporations subject to taxation under G. L. c. 63 a "business infrastructure development assessment." § 19. The rates would be set in c. 63D, and

the assessment would be payable in the same manner and at the same time as the corporate excise. Subject to certain conditions the Commissioner of Revenue would be required to adjust the rates if the total assessments in a given year fell below or exceeded $145 million. Net sums received from this source would be dedicated, through the State Treasurer, as trustee, to Mass/Bank. Each year the Treasurer would transfer to Mass/Bank an amount from these funds not in excess of $145 million. § 19.

To increase the marketability of Mass/Bank debt obligations, revenues generated under the new c. 63D would be "impressed with a trust and dedicated exclusively to the purposes of Mass/ Bank, to be disbursed solely in accordance with the limitations and conditions prescribed herein." § 14. The bill includes a covenant between the Commonwealth and purchasers of the debt obligations that Mass/Bank income, assets, and activities would be exempt from Massachusetts taxes; the powers, duties, and existence of Mass/Bank would not be altered so as to affect adversely the interests of holders of debt obligations; the revenues pledged to Mass/Bank would not be diverted nor the trust with which they are impressed broken; and the rates of assessments imposed under proposed new c. 63D would not be reduced (except as provided in the act) unless equivalent revenues similarly pledged were provided. § 14.

The bill would also amend G. L. c. 29 by inserting a new § 7M establishing "on the books of the commonwealth" a separate fund to be known as the "State Infrastructure Fund," consisting of all revenues received by Mass/Bank as financing assistance to State agencies for approved State infrastructure programs. The funds would be available only for such programs. § 18.

The bill would appropriate $1 million to be paid to Mass/ Bank for start-up costs. § 15. Mass/Bank would be required to repay this money, without interest, within two years from the effective date of the act or the date of the first issuance of debt obligations by Mass/Bank.

The House expresses grave doubt as to the constitutionality under the State Constitution of House No. 6140, if enacted into law.

We are asked to answer the following important questions of State constitutional law:

"1. (a) Is the assessment established in Chapter 63D of the General Laws, inserted by section 19 of House, Bill 6140, a tax?

"(b) If the answer to (a) is that said chapter 63D establishes a tax:

"(i) Is it constitutionally competent for the General Court to establish such a tax for the purpose of funding a body politic and corporate as set forth in section 4 of House, Bill 6140 which creates a class of bondholders as beneficiaries of state revenue?

"(ii) Is it constitutionally competent for the General Court to delegate to the commissioner of revenue the power to increase or decrease the rates of assessment of a tax as set forth in said Chapter 63D, inserted by section 19 of House, Bill 6140?

"2. Would it be violative of Section 1 of Article 63 of the Amendments to the Constitution to provide that revenue received as provided in sections 18 and 19 of House, Bill 6140 shall not be 'money received on account of the commonwealth' and therefore, may not be paid into the treasury thereof?

"3. Would it be violative of Sections 2, 3, and 4 of Article 63 of the Amendments to the Constitution to provide that revenue received by the state treasury pursuant to sections 18 and 19 of House, Bill 6140 may be expended without appropriation?

"4. Would it be violative of Article 30 of Part I or Article 4 of Section 1 of Chapter 1 of Part 2 of the Constitution to grant the commissioner of revenue the discretionary powers set out in section 24 of House, Bill 6140?

"5. Considering the provisions of section 7 of House, Bill 6140 that MASS/BANK may issue debt obligations

for state infrastructure programs or projects only with a two-thirds vote of the General Court; and considering the provisions of section 8 of said House, Bill 6140 relative to the maintenance of a debt reserve fund; and considering the source of revenue assets or funds available to MASS/BANK for the payment of its debt obligations, do the debt obligations of MASS/BANK authorized by House, Bill 6140 constitute, as a matter of law, a debt of the commonwealth or a pledge of its faith and credit, notwithstanding the provisions of section 9 of said House, Bill 6140 to the contrary?"[2]

The first question is directed to § 19 of the bill, which would insert in the General Laws a new c. 63D for the purpose of imposing on all corporations subject to taxation under G. L. c. 63, a "business infrastructure development assessment," the proceeds of which would be dedicated, through the State Treasurer, as trustee, to Mass/Bank.

Question 1(a) asks whether the "assessment" imposed would be a "tax." We assume that the word "tax" is used in the broad sense of a revenue-raising exaction imposed through generally applicable rates to defray public expenses. P. Nichols, Taxation in Massachusetts 3-4, 15 (3d ed. 1938). To determine whether the monetary exaction to be imposed is a tax, we look to the proposed operation of the exaction. *Emerson College* v. *Boston,* 391 Mass. 415, 423-424 (1984). *Eaton, Crane & Pike Co.* v. *Commonwealth,* 237 Mass. 523, 528 (1921).

Examination of the provisions of proposed new c. 63D discloses that the effect of the new law would be to increase the excise presently imposed on business corporations. The rates applicable to the various classes of business corporations would

---

[2] We acknowledge with appreciation briefs of amici curiae submitted on behalf of the Governor; the Attorney General; Shawmut Bank of Boston, N.A.; Greater Boston Chamber of Commerce; New England Legal Foundation; and Massachusetts Taxpayers Foundation, Inc., and by Gaston Snow & Ely Bartlett and Palmer & Dodge at the request of the Governor; by Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., at the request of the Governor and the Treasurer and Receiver General; and a private citizen.

be calculated in the same way that corporate excise rates are calculated. § 19. All provisions in G. L. c. 62C and c. 63 regarding the administration of taxes, including "assessment, collection, payment, abatement, verification and audit thereof," to the extent pertinent, would apply to the infrastructure development assessment. It is clear that the assessment would constitute an additional corporate excise.

Our conclusion is supported, additionally, by the fact that the principal means for raising revenue from corporations has been through the imposition of an excise. *Eaton, Crane & Pike Co.* v. *Commonwealth, supra* at 526-527. The authority of the Legislature to levy such an excise emanates from Part II, c. 1, § 1, art. 4, of the Massachusetts Constitution, which provides in part, "[F]ull power and authority are hereby given and granted to the said General Court . . . to impose and levy, reasonable duties and excises, upon any produce, goods, wares, merchandise, and commodities, whatsoever, brought into, produced, manufactured, or being within the same." The excise is levied on corporations for the privilege of doing business in the Commonwealth. *Andover Sav. Bank* v. *Commissioner of Revenue,* 387 Mass. 229, 233, 235 (1982). *Commissioner of Revenue* v. *Massachusetts Mut. Life Ins. Co.,* 384 Mass. 607, 612 (1981). *S.S. White Dental Mfg. Co.* v. *Commonwealth,* 212 Mass. 35, 38 (1912), aff'd, 231 U.S. 68 (1913). The power of the State to impose excises on business corporations is very broad, the sole State constitutional limitation being that the excise levied be "reasonable." *Commissioner of Revenue* v. *Massachusetts Mut. Life Ins. Co., supra.* See *Springfield Ins. Co.* v. *State Tax Comm'n,* 342 Mass. 505, 512-515 (1961).

Having determined that the infrastructure development assessment would operate as a corporate excise, we conclude that the assessment would constitute a "tax" as we have broadly defined that term.

We answer question 1(a), "Yes."

Question 1(b)(i) inquires, in effect, whether the General Court constitutionally may establish such a "tax" for the purpose of funding Mass/Bank where the bill purportedly would create "a class of bondholders as beneficiaries of state revenue."

A law enacted to accomplish an important public purpose is not rendered constitutionally defective simply because it results in an incidental benefit to private individuals. *Massachusetts Bay Transp. Auth.* v. *Boston Safe Deposit & Trust Co.,* 348 Mass. 538, 542 (1965). *Court St. Parking Co.* v. *Boston,* 336 Mass. 224, 229-231, appeal dismissed sub nom. *Rosengard* v. *Boston,* 355 U.S. 272 (1957). The purpose of establishing Mass/Bank is obviously public. The bill declares in § 1 (*b*) that the Commonwealth and governmental units are in need of a new financing mechanism to undertake public improvements described as "infrastructure."[3] Mass/Bank would provide a new financing source, in part, "through the issuance of debt obligations." § 1 (*h*). Payment of these debt obligations would be secured by a "debt service reserve fund" which would be required to be maintained at a specified minimum level. § 10 (*c*). The revenue generated by the infrastructure development assessment would be "impressed with a trust and dedicated exclusively to the purposes of Mass/Bank, to be disbursed solely in accordance with the limitations and conditions prescribed herein." § 14. Included in the conditions is a covenant between the Commonwealth and purchasers of debt obligations that the revenues thus pledged and dedicated would not be diverted from Mass/Bank nor the trust with which they would be impressed broken and that the rates of corporate assessments would not be reduced unless equivalent revenues similarly pledged were provided. Provision would be made to ensure maintaining an annual level of income from corporate assessments of $145 million. § 19.

These security provisions are designed, in the main, to increase the marketability of Mass/Bank debt obligations and, thus, to further the important public purpose of providing a new financing mechanism for the Commonwealth and governmental units to use to make improvements in the capital infrastructure. The benefit bondholders would derive, then, would be added security that the money they pay to purchase Mass/Bank bonds would be repaid with the designated interest.

---

[3] For a complete recital of all infrastructure elements see § 1 (*a*) of the bill quoted in note 1, *supra*.

This benefit to private parties is an incident essential to the accomplishment of the important public purpose of the bill. It would not, by itself, render the bill unconstitutional. *Opinion of the Justices,* 368 Mass. 880, 885-886 (1975).

Accordingly, we answer question 1(b)(i), "Yes."

Question 1(b)(ii) inquires whether the General Court constitutionally may delegate to the Commissioner of Revenue the authority to increase or decrease the rates of the infrastructure development assessment.

The provisions involved are in § 3 of proposed new c. 63D. Designed to maintain an annual income from the infrastructure development assessment of $145 million, the section would authorize the Commissioner to adjust the rates of assessment to achieve that goal. More specifically, if, as of June 30, collections in excess of $145 million and the income from such excess collections equal or exceed $10 million, the Commissioner would be required to "lower all rates of assessment proportionately" for subsequent taxable years commencing on or after the following January 1. The rates would have to be set so as to raise "as nearly as possible" $145 million annually (including excess collections and income therefrom held by the Commonwealth). If, on the other hand, after lowering the rates, the collections do not reach $145 million (including excess collections and income therefrom), the Commissioner would be required, on or before December 1, to increase the rates proportionately to a level that would produce $145 million; however, the Commissioner would not be allowed to raise the rates higher than those fixed in the bill.

Firmly established in our jurisprudence is the principle that the General Court may not delegate the general power to make laws. *Arlington* v. *Board of Conciliation & Arbitration,* 370 Mass. 769, 775 (1976). *Corning Glass Works* v. *Ann & Hope, Inc.,* 363 Mass. 409, 421 (1973). Art. 30 of the Declaration of Rights. Part II, c. 1, § 1, art. 4, of the Massachusetts Constitution. Equally well established is the principle that the Legislature may delegate to an officer of the executive branch the working out of the details of a policy established by the General Court. *Opinion of the Justices,* 384 Mass. 840,

845 (1981). However, clear legislative standards must be provided to guide the officer in exercising the delegated authority in accordance with the legislative policy. *Massachusetts Bay Transp. Auth.* v. *Boston Safe Deposit & Trust Co., supra* at 544. Provision for judicial review is needed to ensure that the authority delegated is used in accordance with the standards and policy adopted by the General Court. *Opinion of the Justices,* 368 Mass. 831, 836-837 (1975). *Corning Glass Works* v. *Ann & Hope, Inc., supra* at 422. Like other legislative powers, the power to tax may be delegated as long as these rules are followed. See *Emerson College* v. *Boston,* 391 Mass. 415, 422 n.14 (1984). *Commissioner of Revenue* v. *Massachusetts Mut. Life Ins. Co., supra* at 610-611.

In § 3 of the proposed new c. 63D, the legislative policy is clear: Maintain an annual income from infrastructure development assessments of $145 million for use by Mass/Bank. Specific guidelines are drawn for the Commissioner in exercising the power to adjust rates: he may lower rates only if excess collections equal or exceed $10 million, may increase rates only when the lowered rates fail to produce $145 million, may not increase rates above those fixed in the proposed statute, may only lower or raise rates proportionately with respect to all categories of corporations subject to the assessment, and must take such action on or before dates set by the proposed law.

Thus, when exercising the power to adjust rates, the Commissioner would be strictly confined by the detailed directions laid down in the bill. His function would be limited to mathematical calculations. His determinations would be subject to the same administrative and judicial review provisions of the law as his decisions regarding the corporate excise.

We conclude that there is no constitutional impediment to delegating to the Commissioner of Revenue the power to adjust rates in accordance with the detailed directions set out in the bill.

Therefore, we answer question 1(b)(ii), "Yes."

Questions 2 and 3 ask, in effect, whether the revenues that would be received under §§ 18 and 19 would be "money received on account of the commonwealth" and payable to the

State treasury, under § 1 of art. 63 of the Amendments to the Massachusetts Constitution, and be subject to the appropriation provisions in §§ 2, 3, and 4 of art. 63.

Section 18 of the bill would insert a new § 7M in G. L. c. 29 (governing State finances). It would establish and "set up on the books of the commonwealth a separate fund, to be known as the State Infrastructure Fund." The fund would consist of "all revenues received from the Massachusetts Development Bank as financing assistance provided to agencies of the commonwealth for approved state infrastructure programs."

Section 19 of the bill would require that all net sums received under the proposed new c. 63D "be dedicated, through the state treasurer as trustee, to Mass/Bank." It would also require that a sum not to exceed $145 million in any fiscal year ending June 30 "shall be transferred, as received, to Mass/Bank." The funds would be available "for any purposes for which Mass/Bank is authorized to expend funds subject to any prior pledge by Mass/Bank of any such revenues as security for debt obligations of Mass/Bank." Any excess amounts (and income therefrom) would be held by the Commonwealth and used in a subsequent year that the new assessment failed to generate $145 million.

Article 63 establishes the process by which Commonwealth revenues are to be received and disbursed. It provides in § 1 that "[a]ll money received on account of the commonwealth from any source whatsoever shall be paid into the treasury thereof." The Governor is required by § 2 to submit to the General Court a budget for the fiscal year specifying the means by which expenditures will be defrayed (taxes, revenues, loans, and other sources). All appropriations based on the budget and payable from taxes or revenues, must be incorporated in a single general appropriation bill. The Legislature is authorized, however, to enact special appropriation bills, but they must specify the means for defraying the appropriations. The Governor, under § 5, has power to disapprove or reduce items in an appropriation bill. See *Opinion of the Justices,* 375 Mass. 851, 853-854 (1978).

As is plain from its provisions, art. 63 is designed "to centralize, and improve control of, the Commonwealth's funds and to insure careful consideration of their expenditure." *Opinion of the Justices,* 349 Mass. 804, 807 (1965). The Justices have recognized, however, that not all revenues received by the Commonwealth are subject to the provisions of art. 63. Funds received by the Commonwealth and held in trust, to be disbursed only in compliance with legislatively prescribed conditions, are not subject to art. 63 even though they are received "on account of the commonwealth" and the State Treasurer is named as custodian of the fund. *Opinion of the Justices,* 375 Mass. 851, 854 (1978). See *Manchester* v. *Department of Envtl. Quality Eng'g,* 381 Mass. 208, 218 n.9 (1980). In *Howes Bros.* v. *Unemployment Compensation Comm'n,* 296 Mass. 275 (1936), cert. denied, 300 U.S. 657 (1937), the court found no violation of art. 63 by a law which imposed a monetary exaction on employers and employees and required the Commission to collect the money and pay it to the State Treasurer as a fund from which unemployment benefits would be paid. Although the monies exacted were "manifestly . . . received on account of the Commonwealth," the court found no violation of art. 63, noting that the "contributions as and when paid immediately become a part of the unemployment compensation fund and constitute a continuing trust fund for beneficiaries definitely described in the unemployment compensation law." *Id.* at 289, 290. Those funds could not be directed to a purpose other than paying benefits under the unemployment compensation law.

Although the funds in the *Howes Bros.* case were raised pursuant to the Commonwealth's police power, the exception to the requirement that art. 63 be followed would apply also to funds raised by means of the Commonwealth's taxing power. In an analogous situation the court found no violation of art. 63 where State income taxes were placed by the State Treasurer in an "Agency Account" and distributed to cities and towns pursuant to legislatively prescribed conditions. Although no express trust was created, there, an implied trust was established for the benefit of the cities and towns. *Dane* v. *Treasurer*

*& Receiver Gen.,* 237 Mass. 50, 52, aff'd sub nom. *Dane* v. *Jackson,* 256 U.S. 589 (1921).

On the other hand, the Justices found violative of art. 63 a bill that would permit the distribution to cities and towns for local highway purposes money from the "Highway Fund" (consisting largely of fees charged for the use and operation of motor vehicles and trailers, contributions and assessments by municipalities for maintaining and building ways, and receipts from a fuel excise). *Opinion of the Justices,* 300 Mass. 630 (1938). Distinguishing the *Dane* decision, the Justices stated that the "money was not originally received, expressly or impliedly, for the benefit of cities and towns." *Id.* at 638. Distinguishing the *Howes Bros.* case, the Justices stated, "Nor are the amounts which comprise the fund, though 'credited on the books of the commonwealth' to the Highway Fund, charged at the time of collection with a trust which can be carried out without compliance with the provisions of said art. 63 of the Amendments . . . ." *Id.* at 637.

The Justices also found violative of art. 63 a bill that would have provided that all revenues (except $500,000) received by the Commonwealth from fishing and hunting license and permit fees (and certain related income) would be held in a fund and administered and expended by the fish and game board for specified purposes without appropriation. *Opinion of the Justices,* 334 Mass. 716 (1956). "Most important of all," the Justices observed, "no sums of money are separately designated for any of these purposes; nor is there any total amount for all of them combined." *Id.* at 719. Again the Justices distinguished the *Dane* case (and related cases), stating that the "proposed act is not one in which the Commonwealth establishes a system of taxation whereby it collects money primarily for the benefit of the cities and towns and then distributes the money so collected among the cities and towns." *Id.* The Justices also pointed out the crucial difference between the bill they were reviewing and the Unemployment Compensation Act reviewed in *Howes Bros.*: "[T]he moneys involved came to the Commonwealth impressed with a trust; and the proposed act does not create a trust. There are no beneficiaries. All expenditures are

simply for the benefit of the public, as are expenditures of the Commonwealth in general." *Id.* at 720. In finding that the bill would violate art. 63 the Justices concluded, "By the proposed act moneys of the Commonwealth would be expended by an agency of the Commonwealth for purposes of the Commonwealth in a manner no different from the expenditure of other moneys, except that there would be no appropriation." *Id.*

We assume for the purpose of answering the questions put that the revenues received pursuant to § 19 of the bill would constitute "money received on account of the commonwealth." Nevertheless, those revenues would not be subject to the requirements imposed by art. 63, for those funds would be received in trust and disbursed according to conditions prescribed in the bill. Section 14 of the bill provides that those revenues would be "impressed with a trust and dedicated exclusively to the purposes of Mass/Bank, to be disbursed solely in accordance with the limitations and conditions prescribed herein." Section 6 of the proposed new c. 63D would direct the State Treasurer, as trustee of the revenues, to transfer to Mass/Bank an amount not to exceed $145 million in any fiscal year.

Mass/Bank would be authorized to use the revenues received "for any purposes for which Mass/Bank is authorized to expend funds subject to any prior pledge by Mass/Bank of any such revenues as security for debt obligations of Mass/Bank." The principal purpose for which Mass/Bank would be empowered to spend the funds would be to provide financing assistance for State infrastructure projects and programs and local infrastructure projects. The procedures to be followed by Mass/Bank prior to providing financing assistance, summarized at the outset of this opinion, are laid out in detail in §§ 7 and 8 of the bill.

Another major purpose for which Mass/Bank would be authorized to expend funds would be to pay interest, principal, and premiums on debt obligations it issues in connection with supplying financing assistance. § 10 (*a*). The bill provides in painstaking detail not only the manner in which debt obligations would be issued but also the provisions to be made for their repayment, including the securing of the obligations through one or more trust agreements with a trust company or bank with

trust company powers (§ 10 [b]) or through the creation of one or more debt service reserve funds (§ 10 [c]).

Thus the bill would subject the revenues received under proposed new c. 63D to a trust to be administered in accordance with specifically prescribed conditions by Mass/Bank, a public instrumentality charged with carefully defined public purposes. The beneficiaries of the trust would be the purchasers of Mass/ Bank debt obligations, for they would benefit from the added security it would provide.

The apparent purpose for imposing a trust on these revenues is to provide security to those who acquire Mass/Bank debt obligations. Section 14 provides that "all revenues generated" under proposed new c. 63D would be impressed with a trust "to increase the marketability of debt obligations to be issued by Mass/Bank." Section 19 provides that the revenues may be spent by Mass/Bank for any purpose authorized "subject to any prior pledge by Mass/Bank of any such revenues as security for debt obligations of Mass/Bank." In addition, § 1 (c) declares that it is in the public interest "to encourage investors to purchase bonds and notes for the benefit of governmental units as sound and preferred securities for investment." Furthermore, § 14 provides that the Commonwealth would covenant with acquirers of Mass/Bank debt obligations "for so long as the principal of or interest on any such obligation remains unpaid," that, among other things, "the [c. 63D] revenues pledged and dedicated hereunder shall not be diverted from Mass/Bank, nor shall the trust with which they are impressed be broken."

We conclude that the revenues to be received under proposed new c. 63D would not be subject to the requirements of art. 63 since those funds would be impressed with a trust established to secure the debt obligations of Mass/Bank, which could disburse those funds only in accordance with specific legislative conditions and within the carefully defined limitations established in the bill.

Funds to be received by the State Treasurer under § 18, however, stand on a different footing from revenues received pursuant to the imposition of the infrastructure development assessment under § 19. Section 18 funds would be transferred

by Mass/Bank to the State Treasurer to be maintained in a separate fund. It is contemplated under § 7 (*e*) of the bill that these revenues would come exclusively (or nearly so) from the proceeds of debt obligations of Mass/Bank. Like the Massachusetts Port Authority, Mass/Bank would be a public instrumentality with a corporate existence separate and distinct from the Commonwealth. Hence any funds it received would be held by it on its own account not "on account of the commonwealth." *Opinion of the Justices,* 334 Mass. 721, 734-735 (1956). Cf. *Opinion of the Justices,* 300 Mass. 630, 637 (1938). The funds would be received on account of Mass/Bank and, by clear implication, disbursed at the direction of Mass/Bank. The Legislature may, as a matter of convenience and without violating art. 63, designate the State Treasurer as the custodian of a fund consisting of revenues received from a public instrumentality such as Mass/Bank. *Horton* v. *Attorney Gen., 269* Mass. 503, 511-512 (1929). Since revenues to be received by the Treasurer under § 18 for deposit in the State Infrastructure Fund would not be received on account of the Commonwealth, the requirements of art. 63 have no application.

Having concluded that revenues received under §§ 18 and 19 of the bill would not be subject to the provisions of art. 63, we answer questions 2 and 3, "No."

The fourth question asks whether the grant to the Commissioner of Revenue of the discretionary powers under § 24 of the bill would violate art. 30 of the Declaration of Rights or Part II, c. 1, § 1, art. 4, of the Massachusetts Constitution.

Section 24 would amend § 42 of G. L. c. 63. Section 42 now provides, for corporate excise purposes, that a corporation may apply to the Commissioner to have its income derived from business carried on in Massachusetts determined by a method other than that required by § 38 of G. L. c. 63. Section 38 prescribes in great detail the manner in which the Commissioner must determine what part of a corporation's income is derived from business carried on in the Commonwealth. General Laws c. 63, § 42, as amended by St. 1969, c. 599, § 1, now permits the Commissioner "by reasonable methods [to] determine the amount of net income derived from business

activity carried on within this commonwealth" if, in his judgment, "the allocation and apportionment provisions of this chapter are not reasonably adapted to approximate the corporation's net income derived from business carried on within this commonwealth." The section offers no further specification of this broad mandate.

If enacted into law, the new § 42 would also provide for alternative means of determining the amount of income a corporation derives from business carried on in Massachusetts. It would allow a corporation to elect an alternative method. The new § 42 would authorize the Commissioner to require a corporation to use an alternative method if the apportionment provisions of G. L. c. 63 did "not fairly represent the extent of the activity in this commonwealth of any corporation subject to taxation under this chapter."

The new § 42 would restrict somewhat the Commissioner's present authority to use "reasonable [alternative] methods" to determine a corporation's income allocable to Massachusetts by specifying that he may require, as to a corporation's business activity, "(1) separate accounting, (2) exclusion of any one or more factors, (3) inclusion of one or more additional factors which will fairly represent the corporation's business activities in this commonwealth, or (4) employment of any other method to effectuate an equitable apportionment of the corporation's income." The Commissioner would be authorized to act pursuant to clause (4) to determine a corporation's income "by apportioning the combined income of the unitary business of the affiliated group of corporations of which the corporation is a member." The new § 42 would define "unitary" business and "affiliated group" and would specify in detail the circumstances in which the Commissioner could use this alternative method.[4]

---

[4] Section 24 defines "affiliated group" as "one or more corporations connected through stock ownership with a common owner or owners in which eighty per cent or more of the voting stock of each member is directly or indirectly owned by such common owner or owners." The section provides further, "A business carried on by a group of affiliated corporations is unitary where the activities of the corporations are dependent upon or inte-

Applying to § 24 of the bill the principles regarding delega-
tion of legislative power we set out in response to question
1(b)(ii), we find no violation of art. 30 of the Declaration of
Rights or of Part II, c. 1, § 1, art. 4, of the Massachusetts
Constitution. The legislative policy in § 24 is readily discern-
ible: that income used to measure the excise to be imposed
under G. L. c. 63 should be determined by a method that fairly
represents the corporation's business activity in the Common-
wealth. The guidelines for selecting an alternative method of
apportioning income, while somewhat general, are far more
specific than the guidelines in the present version of § 42.
They would be constitutionally adequate in light of the Com-
missioner's expertise in the area and the availability of adminis-
trative and judicial review of decisions he would make under
proposed § 42.[5]

We answer question 4, "No."

Question 5 inquires whether the debt obligations of Mass/
Bank authorized by the bill would constitute "a debt of the
commonwealth or a pledge of its faith and credit" notwithstand-
ing provisions in § 11 to the contrary.[6] We are asked, in re-
sponding, to consider the provisions in § 7 (authorizing Mass/
Bank to issue debt obligations for State infrastructure programs
and projects), § 10 (c) (authorizing Mass/Bank to establish
"debt service reserve funds" from which payments on the debt
obligations would be made)[7], and "the source of revenue assets

---

grated with or contribute to each other in a material way." Other provisions
further limiting the circumstances in which the Commissioner would be
able to use this alternative method of determining a corporation's income
derived from business done in the Commonwealth appear in § 24.

[5] Review by the Appellate Tax Board would be available under G. L.
c. 62C, § 39. Decisions by the Appellate Tax Board would be reviewable
by the Supreme Judicial Court. G. L. c. 58A, § 13.

[6] The question refers to § 9, which deals with the subject of Mass/Bank's
evaluation of infrastructure programs and projects and its obligation to make
reports. The reference apparently intended was to § 11, which addresses
the subject referred to in the question.

[7] The question refers to § 8, which governs the process by which Mass/
Bank would be able to provide financing assistance for local infrastructure
projects and municipal projects. The reference apparently intended was to
§ 10 (c), which deals exclusively with debt service reserve funds.

or funds available to Mass/Bank for the payment of its debt obligations."

The constitutional provisions involved are §§ 1 and 3 of art. 62, as amended, of the Amendments to the Massachusetts Constitution. Section 1, as appearing in art. 84 of the Amendments to the Massachusetts Constitution, provides, in pertinent part, "The commonwealth may give, loan or pledge its credit only by a vote, taken by the yeas and nays, of two-thirds of each house of the general court present and voting thereon." In relevant part, § 3 provides that "the commonwealth may borrow money only by a vote, taken by the yeas and nays, of two thirds of each house of the general court present and voting thereon." It provides also that the Governor "shall recommend to the general court the term for which any loan shall be contracted."

We address first § 7 of the bill to which our attention is directed in the question. Subsection (*a*) specifies, "The issuance of debt obligations for state infrastructure programs or projects shall be authorized by vote of two-thirds of each house of the general court present and voting thereon." This provision simply restates the general restriction on Mass/Bank's authority to issue debt obligations defined in § 6 (*k*) of the bill: "Mass/Bank shall have the power, except as otherwise specifically limited in this act . . . (*k*) To borrow money and to issue its debt obligations and to provide for the rights of the holders hereof; as long as the issuance of such debt obligations has been approved by a vote, taken by the yeas and nays, of two-thirds of each house of the General Court present and voting thereon."

To answer the question whether the debt obligations of Mass/Bank would constitute a debt of the Commonwealth within the meaning of art. 62, as amended, we must examine the provisions in the bill to determine whether Mass/Bank has "a substantive existence independent of the Commonwealth" so that when it issues debt obligations it will be Mass/Bank which is doing the borrowing and not the Commonwealth, thus rendering art. 62 inapplicable. *Opinion of the Justices,* 354 Mass. 779, 785 (1968).

Our study of the provisions in the bill relating to the structure, purposes, powers, and duties of Mass/Bank discloses that it would be an entity separate and distinct from the Commonwealth. It would be "a body corporate and politic and a public instrumentality" created to provide financing assistance as well as organizational support to State and local governmental agencies with respect to infrastructure programs or projects. § 1 (*h*). It would not be subject to the control of any State office, department, agency or other State unit (except as specifically provided in the bill). § 4. Governing the operations of Mass/Bank would be a board of directors consisting of the Secretary of Administration, the Treasurer and Receiver General, and three members to be appointed by the Governor. § 5 (*a*) (*b*) (*d*) (*f*). The board would be authorized to employ other officers and employees. § 5 (*j*). The bill provides in great detail for deferred compensation, retirement, and other employee benefits. § 5 (*l*)-(*n*). It also declares the liability and limitations thereon of Mass/Bank members, officers and employees. § 5 (*o*).

Mass/Bank would be given extensive powers including, among others, the power to sue and be sued, to make contracts, to acquire real and personal property, to borrow money and to issue its debt obligations (subject to the two-thirds voting requirement by the Legislature mentioned above), to pledge its assets and funds, to invest money not required for immediate use, to collect fees for services it performs, to monitor the progress of infrastructure programs and projects, to provide financing assistance to participating units, to buy and sell municipal securities, and "[t]o do any and all things necessary or convenient to carry out its purposes and exercise the powers given and granted in this act." § 6.

Mass/Bank would be required to provide financing assistance for State infrastructure programs and projects certified by the Secretary of Administration. § 7. Mass/Bank would also be authorized to provide financing assistance to governmental units for local infrastructure projects and municipal projects upon certification by the Secretary of Communities and Development and the Secretary of Administration. § 8.

The corporate existence of Mass/Bank would continue "until terminated by law, but no such law shall take effect so long as Mass/Bank shall have debt obligations outstanding, unless adequate provision has been made for the payment thereof." § 5 (r).

This review of Mass/Bank's structure, purposes, powers and duties demonstrates its independent existence and substantial long-term public responsibilities. It would not be a corporate device created for a single temporary purpose with a restricted function, designed simply to evade the constitutional mandate of art. 62. Cf. *Ayer* v. *Commissioner of Admin.*, 340 Mass. 586 (1960). The debt obligations it would issue would be those of Mass/Bank and not of the Commonwealth. Since these obligations would not constitute debts of the Commonwealth, art. 62 would have no application.

The second consideration in question 5 requires us to determine whether the provision in the bill authorizing Mass/Bank to establish debt service reserve funds to secure payment of debt obligations would involve a pledge of the Commonwealth's credit. Those funds would be established by Mass/Bank and would include any money appropriated and made available by the Commonwealth for the funds, proceeds of the sale of debt obligations, and any other money available to Mass/Bank for the purpose. § 10 (c). That these reserve funds might include funds appropriated by the Commonwealth does not convert the reserve funds to a pledge of the Commonwealth's credit. The bill makes no provision guaranteeing appropriations for the fund. Although § 10 (c) requires the Secretary of Administration to request an appropriation if the debt service reserve funds fall below a specified level and expresses the intention that an appropriation be made, it also provides that "the general court at the time of any such request for appropriation shall be under no obligation to appropriate any such amount." The declaration of expectation in the bill for future appropriations has no binding effect. *Massachusetts Hous. Fin. Agency* v. *New England Merchants Nat'l Bank*, 356 Mass. 202, 216 (1969). The provision, then, would not constitute a pledge of the Commonwealth's credit.

Finally question 5 requires us to consider the source of revenue, assets or funds available to Mass/Bank for payment of its debt obligations to determine whether those obligations constitute a debt of the Commonwealth or a pledge of its credit.

According to § 10 (*a*) of the bill Mass/Bank may pay debt obligations from revenues it receives from projects, reserve funds, investment income, proceeds from the issuance of re-funding debt obligations, and "from any available revenues or assets of Mass/Bank." All of these revenues would belong to Mass/Bank, not the Commonwealth, and hence could be pledged without a violation of art. 62. Some would be revenues received pursuant to the infrastructure development assessment. These revenues would be "impressed with a trust and dedicated exclusively to the purposes of Mass/Bank." § 14. The Commonwealth would covenant with "the purchasers and all subsequent holders and transferees of such debt obligations that while any such obligation remains outstanding, and for so long as the principal of or interest on any such obligation remains unpaid . . . (iii) the revenues pledged and dedicated hereunder shall not be diverted from Mass/Bank, nor shall the trust with which they are hereby impressed be broken" and the rates of assessment "shall not be repealed or reduced" except as otherwise provided in the bill "unless equivalent revenues similarly pledged are provided, and the pledge and dedication in trust of such revenues shall continue unimpaired and unabrogated." § 14. By the language of the bill itself this commitment by the Commonwealth of an earmarked stream of revenue to secure payment of Mass/Bank's debt obligations would be made "to increase the marketability of debt obliga-·tions to be issued by Mass/Bank." § 14.

Neither the commitment by the Commonwealth of revenues to secure payment of Mass/Bank debt obligations nor its covenant with purchasers thereof would convert a debt of Mass/Bank to a debt of the Commonwealth. See *Massachusetts Bay Transp. Auth.* v. *Boston Safe Deposit & Trust Co.*, 348 Mass. 538, 556-557 (1965). Nonetheless, they would result in a pledge of the Commonwealth's credit as soon as the first issue of debt obligations was approved by the General Court. Cf.

*Massachusetts Bay Transp. Auth.* v. *Boston Safe Deposit &
Trust Co., supra* at 559 (where the court determined that enact-
ment of the statute itself constituted the pledge of the Common-
wealth's credit).[8] Since the bill would require approval by
two-thirds of the members of both Houses of the General Court
present and voting (§ 6 [*k*]) there would be no violation of § 1
of art. 62.

We respond to question 5, as follows:

> "No" so far as the question pertains to a "debt" of the
> Commonwealth; "Yes" so far as the question pertains to
> a "pledge" of the Commonwealth's credit.

In summary, we answer,

> Question 1(a), "Yes";
> Question 1(b)(i), "Yes";
> Question 1(b)(ii), "Yes";
> Question 2, "No";
> Question 3, "No";
> Question 4, "No";
> Question 5, "No" as to debt; "Yes" as to pledge.

---

[8] In the case cited the court concluded that "[t]he enactment of the statute
was the pledge of the Commonwealth's credit within the meaning of the
article." 348 Mass. at 559. The statute under review there authorized the
public authority to issue bonds without first obtaining legislative approval.
Consequently, as the court observed, "The legislative function in respect
of [the pledging of the Commonwealth's] credit under c. 161A was complete
when the bill was enacted." *Id.* at 558. The legislative function as to the
pledging of the Commonwealth's credit with respect to Mass/Bank's debt
obligations, however, would not be complete until the General Court voted
to authorize Mass/Bank to issue debt obligations.

The foregoing answers are submitted by the Chief Justice and the Associate Justices, subscribing hereto on the twenty-eighth day of November, 1984.

EDWARD F. HENNESSEY
HERBERT P. WILKINS
PAUL J. LIACOS
RUTH I. ABRAMS
JOSEPH R. NOLAN
NEIL L. LYNCH
FRANCIS P. O'CONNOR